**United States District Court
for the District of Columbia**

| | | |
|---|---|---|
| Ralph deToledano, an individual, | ) | |
| | ) | Civil Action No. 1:06cv01214 (JDB) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| John D. O'Connor, Esq., | ) | |
| William Mark Felt, Jr., and | ) | |
| William Mark Felt, Sr. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPPOSING DEFENDANTS' MOTION TO
STAY ACTION PENDING ARBITRATION**

Plaintiff, by counsel, opposes the motion of defendants John O'Connor and W.

Mark Felt, Sr. to stay this action and to transfer venue. This memorandum is also in

support of plaintiff's motion for an order staying arbitration, filed concurrently.

**A. Introduction**

Defendants and their counsel argue that Mr. deToledano signed contract

documents for the transfer of his copyright interest to Mark Felt Sr. and Mark Felt Jr.,

negotiated by their agent John O'Connor; that the documents contained an arbitration

clause, and that Mr. deToledano was presumably able to read it; that Mr. deToledano

accepted consideration specified in the documents. They state a textbook case, but it is

a case of fraud, both in the procurement of the arbitration provision itself and in the

inducement of the contract. It is a case in which a sophisticated lawyer and his clients

would compel a 90-year-old District of Columbia resident to submit to a lengthy and

costly arbitration proceeding 2,500 miles away in order to reclaim his copyright in a

book he authored.

**B.  Factual and Procedural Background**.

Plaintiff Ralph deToledano is 90 years old, and resides alone in an apartment in the Foggy Bottom neighborhood of the District of Columbia, where he has lived since 1956.  (deToledano Decl., ¶ 1.)  He is neither a "business man" nor a lawyer.  He is an intelligent man, but is aged and infirm, and is prevented from traveling by the bone cancer and acute anemia from which he suffers, and the required treatments for these conditions.  (deToledano Decl., ¶ 8.)  He was 87 when the events in issue took place.

Defendant John O'Connor, who portrays himself as a busy solo practitioner in a small Northern California town, was until recently a senior litigation partner of the 140-lawyer San Francisco law firm of Howard, Rice, Nemerovski, Canady, Falk & Rabkin, and is a former Assistant United States Attorney, having graduated *magna cum laude* in 1972 from the University of Michigan Law School.[1]

Defendant W. Mark Felt, Sr. is an individual who resides in Santa Rosa, California; he worked in the District of Columbia for approximately 32 years until his retirement in 1973 as Deputy Director of the F.B.I., and thereafter collaborated with plaintiff on the book The FBI Pyramid from the Inside ("FBI Pyramid").  His son, defendant W. Mark Felt, Jr., resides in Coral Springs, Florida, and is a senior pilot for American Airlines and a retired U.S. Air Force lieutenant colonel.

Mr. deToledano is the owner of an undivided 50% interest in the copyright in the book The FBI Pyramid, authored substantially by plaintiff with Felt Sr. in 1979, and

---

[1]  Martindale Hubbell International Law Directory, (*Lexis Nexis-Martindale Hubbell*, 2006); www.howardrice.com law firm website, listing representative clients Charles Schwab, Citigroup, Genentech, Hewlett-Packard, Morgan Stanley, Prudential Securities, Sony Online Entertainment, United States Olympic Committee, and Wells Fargo; speaker biography of John O'Connor, at http://premierespeakers.com/4692/index.cfm (Ex. G).

published by Putnam in 1980.  FBI Pyramid is a 351 page biographical non-fiction book about the FBI career of W. Mark Felt, Sr.

Before, during, and after the writing of FBI Pyramid, and until May 2005, W. Mark Felt, Sr. kept a secret of substantial political and commercial interest: that he was the confidential informer popularly known as "Deep Throat," who helped The Washington Post unravel the mysteries of the Watergate break-in and cover-up by Richard M. Nixon's White House.

When asked if he were "Deep Throat," Felt Sr. invariably stated, "I was not he and I am not he."  Felt Sr. "had recently admitted his secret identity, privately, to intimates, after years of hiding the truth even from his family. . .  but [he] was adamant about remaining silent on the subject–until his death–thinking his past disclosures somehow dishonorable," according to a *Vanity Fair* article authored by O'Connor (Ex. B, at 89).  "He has kept quiet through seven presidencies and despite an anticipated fortune that might have come his way from a tell-all book, film, or television special." (*Id.* at 129.)

Felt Sr. also denied his involvement repeatedly to Mr. deToledano on numerous occasions in connection with their work on FBI Pyramid, which was to be a full and accurate account of Felt Sr.'s FBI career, including his role in the investigation of the Watergate break-in.  As Felt Sr. wrote in FBI Pyramid, "I never leaked information to Woodward and Bernstein or to anyone else!"  (Ex. D, at 226.)

On or about May 31, 2005, it was reported for the first time anywhere, in a feature article authored by O'Connor in *Vanity Fair* magazine, that Felt Sr. finally acknowledged to the world that he was indeed "Deep Throat."  (Ex. B.) This fact had been known to Felt Sr.'s immediate family, certain close friends, and to O'Connor, for

several years.  (*Id*. at 132.)  The disclosure made in *Vanity Fair* began a cascade of front page news reports about what the Washington Post called "Washington's most celebrated secret source."  At no time before June 1, 2005 did Mr. deToledano know, or have reason to know, either that Felt Sr. was "Deep Throat," or that Felt Sr. had determined to reveal publicly at any time that he was "Deep Throat."

In 2003, Felt Sr. was in physical and mental decline.  His close family, knowing the truth about his role as "Deep Throat," recognized the commercial value of disclosure of these facts, and urged Felt Sr. that such a disclosure would provide commercial opportunities for his children and grandchildren.  (*See* Ex. B, at 133.)  Because of Felt Sr.'s mental decline, he was no longer in a position to contribute historical facts concerning his FBI career to any commercial exploitation of the "Deep Throat" story.  According to O'Connor, Felt Sr. was capable of making contributions in the area of "big ideas," if you catch him on a "good day." (Ex. I.)  The value of FBI Pyramid to the commercial exploitation of the "Deep Throat" story, as the only existing biography of a man no longer capable of telling his own story, is substantial.

In early 2003, Mark Felt, Jr. proposed acquiring Mr. deToledano's interest in FBI Pyramid.  Felt Jr. explained to Mr. deToledano that he wished to honor his father's FBI career by re-releasing the book with some additional background material about Felt Sr.'s life.  (*See* Complaint, ¶ 14, and Answer of W. Mark Felt, Jr., ¶ 14.) He offered Mr. deToledano 33% of receipts for any substantial use of the original book, and 10% of receipts for any other story about Felt Sr. which did not derive substantially from FBI Pyramid.  Mr. O'Connor then contacted Mr. deToledano.  He did not disclose that he had any personal or financial interest in authoring, promoting or licensing the story of Felt Sr.  O'Connor wrote to Mr. deToledano on May 9, 2003 enclosing a proposed

contract with the 33%-10% royalty structure and an arbitration clause.  Responding to Mr. deToledano's confusion about how the two-tiered royalty structure would be applied, O'Connor attempted to reassure him that "if the parties disagreed as to whether the final version [of the book] entitled you to 10% or 33%, either party would have the right to go to arbitration."  (Ex. 1 to Motion; deToledano Decl., ¶ 6; *see* O'Connor Decl., ¶ 8.)

Mr. deToledano continued to express confusion and disagreement with the proposed terms, and on September 2, 2003, O'Connor wrote that Felt Jr. "understands why you would be upset, based upon that misunderstanding," but in any case, "he suggests we do it even more simply.  He would pay you $5,000.00 in cash for your share of the rights, plus $5,000.00 if he ever gets a book published." O'Connor's statement "if he ever gets a book published" was misleading, because in truth there was little or no doubt that the story of "Washington's most celebrated secret source" would have considerable commercial value.  By letter of September 7, 2003, Mr. deToledano expressed his willingness to accept this new proposal, and his expectation that a "formal" contract be entered into.  (Ex. 5 to Defendants' Motion; deToledano Decl., ¶ 4.)

About six weeks later, on October 27, 2003, O'Connor sent Mr. deToledano a proposed Agreement to Assign Copyright, and Assignment, and represented "we will forward you a check for $5,000.00 upon your execution of this contract."  Mr. deToledano signed and returned both documents.  O'Connor was not to be a party to the proposed agreement.  Several weeks later, when no payment had been received, and O'Connor had failed to respond to Mr. deToledano's telephone calls and letter, Mr. deToledano wrote to inform O'Connor and the Felts that he was canceling his "release," referring to the proposed Agreement to Assign Copyright, because the Felts had failed to pay as agreed.  (deToledano Decl. ¶ 5.)

O'Connor responded on December 15, 2003, asserting that "my client" expected to receive some money, and expected that he would be able to remit the $5,000.00 "by the first of the year, if that is alright." O'Connor attempted to keep Mr. deToledano engaged by assuring him that he (O'Connor) would come to Washington and drop off a $5,000.00 check between January 29 and 31, 2004. That did not happen. Felt Jr. telephoned Mr. deToledano at or near this time, explaining that he was having difficulty coming up with the money, and asking that Mr. deToledano reconsider. (deToledano Decl. ¶ 5.) The first of the year passed, as did all of 2004, and the first of 2005, without payment by the Felts.

What was most probably occurring at this time had nothing to do with money. Felt Jr. was, after all, a senior airline pilot for American Airlines,[2] and was the purchaser of record of two Florida homes in addition to his principal residence between 2001 and 2005.[3] Felt Jr. undoubtedly had access to the funds necessary to honor the proposed agreement. Instead, as O'Connor wrote in *Vanity Fair*, describing the contemporaneous discussions with Felt Sr. about disclosing that he was Deep Throat, "he was amenable at first . . . then he was wavering," he "refused to commit," "our talks dragged on," and Felt Sr. "had other worries." "I don't want this out," he told his son and daughter. (Ex.

---

[2]  According to the Air Line Pilots Association, the average major airline member Captain is 50 years old, with 18 years seniority and makes $182,000 a year; Felt Jr. was 56 at the time, according to O'Connor's *Vanity Fair* article. A 1999 PBS.org story reports that some American Airline pilots make upwards of $250,000 a year. www.pbs.org/newshour/bb/business/jan-june99/american_2-15.html.

[3]  Felt Jr. borrowed $120,000 from the American Airlines Federal Credit Union to purchase a second home in a Florida development known as Villas on the Lake on August 3, 2001 (Ex. E), and on June 10, 2005, borrowed $220,813 to purchase another Florida residence which he declared in loan documents to be a second home (Ex. F). His primary home was apparently a single family residence located at 12702 NW 20th Court, Coral Springs, Florida (the permanent address given on the foregoing loan documents).

B, at 132-33.)  It is apparent that Mr. O'Connor was misleading Mr. deToledano when he attempted to create the appearance of a struggling family that was counting on receiving some money out of which the $5,000 would be paid (my client "thought he had some money coming in several weeks ago," he wrote on December 15, 2003, Ex. 9).

On February 18, 2005, O'Connor wrote to Mr. deToledano, enclosing his personal check for $5,000.00 as payment for "the rights to any and all copyright interest you have in The FBI Pyramid, previously transferred to our clients."  No such "transfer" had ever occurred, because transfer of the rights by assignment was expressly conditioned upon timely payment by the Felt Jr. and Felt Sr. of the first $5,000.00, which had never occurred.  Further, Mr. deToledano had already repudiated his offer to enter into the formal Agreement to Assign Copyright in writing.  Mr. deToledano did not know, over 14 months later, why Mr. O'Connor was paying him $5,000 of his own funds, or what had become of the assignment of copyright he had signed and sent to O'Connor. (deToledano Decl. ¶ 5.)

Commercial exploitation of disclosure of the identity of "Deep Throat" was central to defendants' dealings with plaintiff at all times.  O'Connor reported to the Wall Street Journal in mid-2005 that he was entertaining multiple book and film proposals in relation to Felt Sr.'s revelation that he was "Deep Throat."  The book rights were estimated at as approximately $1,000,000 in a Fox News report of June 1, 2005 (Ex. H).  Once Felt Sr.'s identity as "Deep Throat" had been revealed, O'Connor began negotiations on behalf of the Felts and himself to sell film rights to the story.  (Ex. H, K.)

O'Connor's involvement in these transactions was as a principal, a fact not disclosed to Mr. deToledano.  (*See* Ex. H, K.)  The belated payment on February 17, 2005 was made by O'Connor's personal check, a fact O'Connor has made no effort to

7

explain.  On May 1, 2006, O'Connor sent Mr. deToledano two checks totaling $5,000.00, one of which was again drawn on his personal account.  The other was issued by Kuhn Projects, LLC, of New York, apparently an author's representative or publisher of the book entitled <u>A G-Man's Life</u>, the re-write of <u>FBI Pyramid</u> by O'Connor and Felt Jr.[4]  (<u>A G-Man's Life</u> is a derivative work of FBI Pyramid, as O'Connor concedes, in substance, in the introduction to that work.)  Mr. deToledano never negotiated these checks.  (Allison Decl., ¶ 3.)

On May 10, 2006, O'Connor and the Felts initiated an arbitration proceeding before JAMS/Endispute in San Francisco (*see* Ex. 10), a preemptive action seeking what in essence is a declaratory judgment upholding the Agreement to Assign Copyright (*id.*).  This action followed.

**C.  <u>The Defendants' Motion Should be Denied, and Arbitration Should Be Stayed Pending the Outcome of this Action</u>**

1.  <u>There Is No Agreement to Arbitrate the Parties' Dispute</u>

"In order to be subject to the Federal Arbitration Act, an issue must be "referable to arbitration under an agreement in writing for such arbitration."  9 U.S.C. §3.  A federal court should not stay an action or order the parties to arbitration unless "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."  9 U.S.C. §4.  *See Rollins, Inc. v. Foster*, 991 F. Supp. 1426, 1431 (D. Ala. 1998).  It is beyond peradventure that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Rollins, Inc. v. Foster*,

---

[4]  Mr. O'Connor, as an experienced lawyer, must be presumed to recognize the falsity of his statement under penalty of perjury that Mr. deToledano "cashed the checks totaling $10,000."  (O'Connor Decl. ¶9.)

991 F. Supp. 1426, 1431, citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270 (1967).

Although ordinarily, general questions of arbitrability are to be decided in the first instance by the arbitrator, *Prima Paint*, 388 U.S. at 409, "courts have found that some challenges that go to the 'existence' of the contract fall outside *Prima Paint's* mandate." Such cases "present an issue for the court, rather than the arbitrator, to decide." *Rollins, Inc. v. Foster*, 991 F. Supp. 1426, 1431. *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136 (9th Cir. 1991) held that it is for the court, rather than an arbitrator, to decide initially whether signatories to a contract had the authority to bind plaintiffs. In *Cancanon v. Smith, Barney, Harris, Upham & Co.*, 805 F.2d 998 (11th Cir. 1986) (per curiam), denial of a motion to compel arbitration was affirmed because the defendants had obtained plaintiffs' signatures furtively, or by forgery. In *Chastain v. The Robinson-Humphrey Co.*, 957 F.2d 851, 855 (11th Cir. 1992), the denial of a motion to compel arbitration was affirmed, where the plaintiff *alleged* she had never signed agreement containing arbitration clause.

Defendants appear to contend that California law should apply to the contract issues in this case (*see* Motion, at 6, 7).[5] "Despite the strong policy favoring arbitration, there are circumstances in which California courts may invalidate or limit agreements to arbitrate. Employing 'general contract law principles,' courts will refuse to enforce arbitration provisions that are 'unconscionable or contrary to public policy.' " *Nyulassy v Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 16 Cal. Rptr. 3d 296 (6th Dist 2004),

---

[5] District of Columbia law also requires the court to determine, in the first instance, whether an enforceable agreement to arbitrate exists. D.C. Code § 16-4302; *see Hercules & Co. v. Shama Restaurant Corp.,* 566 A.2d 31, 39 (D.C. 1989) (in the absence of valid agreement to arbitrate, the policies favoring arbitration do not apply).

citing *Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 651, 9 Cal. Rptr. 3d 422 (2004), and *Armendariz v. Foundation Health, supra*.  In *Nyulassy*, an order denying a motion to compel arbitration by Lockheed, the plaintiff's employer, was affirmed, because the arbitration agreement was one-sided and unfair to the employee. The document involved here may be held to be unconscionable whether or not it is found to be a contract of adhesion.  *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1409, 7 Cal. Rptr. 3d 418 (2003).  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33, 111 S. Ct. 1647, 1656, 114 L. Ed. 2d 26 (1991) cautioned that "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide the grounds 'for the revocation of any contract,' " (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627, 105 S. Ct. 3346, 3354, 87 L. Ed. 2d 444 (1985)).

Enforcing the arbitration provision in issue here would defeat the values to be advanced by promoting arbitration agreements, summarized in the legislative history of the F.A.A. and by the Supreme Court as "avoiding 'the delay and expense of litigation,'" being "helpful to individuals. . . complaining about a product, who need a less expensive alternative to litigation," being "cheaper and faster than litigation," and having "simpler procedural and evidentiary rules," and being "less disruptive of ongoing and future business dealings among the parties."  *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265; 115 S. Ct. 834; 130 L. Ed. 2d 753 (1995), citing S. Rep. No. 536, 68th Cong., 1st Sess., 3 (1924), and H. R. Rep. No. 97-542, p. 13 (1982).

In the instant case, while Mr. deToledano's signature appears on a writing containing an arbitration provision, the writing is a nullity for three reasons.

First, Mr. deToledano repudiated his offer to enter into the agreement in writing on December 6, 2003, before it was accepted, as reflected in Ex. 8 to the motion to stay.   The writing signed by Mr. deToledano only, in November, 2003, was one of several drafts prepared by O'Connor, and when Mr. deToledano had signed it, was not itself a contract, but an offer to enter into a contract.

The various writings transmitted by O'Connor to Mr. deToledano were not themselves offers.  In O'Connor's own words, they were a "proposed Agreement and Assignment" (Ex. 2), and contemplated signing by all three parties: Mr. deToledano, Felt Sr., and Felt Jr. (Ex. 2).  Mr. deToledano wrote to O'Connor, as scrivener, on May 27, 2003, complaining that the draft agreement bore "no resemblance" to "the agreement which you were to draw up."  (Ex. 3.)

"Information received by one party that another is *willing* to enter into a bargain," *to wit*, O'Connor's draft agreements, "is not necessarily an offer."  Rest. 2d, Contracts, §23, comment a.  When Mr. deToledano, as the first to sign the November 4, 2003 writing, returned it to Mr. O'Connor, that constituted an offer–an offer that was never accepted.  And, as master of his offer, Mr. deToledano was at liberty to revoke it, which he did on December 6, 2003 (Ex. 8).

As summarized in the Restatement of Contracts 2d, §50, "(1) Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer; (2) Acceptance by performance requires that *at least part of what the offer requests be performed or tendered* and includes acceptance by a performance which operates as a return promise; and (3) Acceptance by a promise requires that the offeree *complete every act* essential to the making of the promise."

Mr. deToledano's signing of the November 4, 2003 writing (Ex. 7) constituted the first step in the making of a formal contract which, the evidence shows, was ultimately aborted. This writing was transmitted to O'Connor, but was never accepted by Felt Sr. or Felt Jr., the only other parties contemplated by the writing. Thus, the "acceptance by a promise" described in Rest. 2d, Contracts, §50(3), never occurred, because acceptance in that way "requires that the offeree *complete every act* essential to the making of the promise." *Id.* A fully executed, formal agreement was what Mr. deToledano required, as he had made clear to Mr. O'Connor: "I presume that on receipt of my letter, you will draw up and send me a formal contract embodying this proposal." (Ex. 5.)

While defendants now contend that an agreement was formed when O'Connor tendered $5,000 of his own funds to Mr. deToledano, this occurred so long after the withdrawal of the offer that it could not possible be held to consummate the same agreement. It was not the prompt payment O'Connor had promised Mr. deToledano would be forthcoming in November, 2003. Indeed, O'Connor himself–an experienced lawyer–wrote *not* that he was tendering consideration for the agreement, but that he was paying for "the rights to any and all copyright interest you have in the FBI Pyramid, previously transferred to our clients." (Ex. A.) Defendants' proposal expressly required payment before any such rights were transferred at all, making it clear, at least, that O'Connor was himself paying for rights he thought had already been transferred to Felt Sr. and Felt Jr. The Restatement 2d requirements for acceptance of an offer by performance require that "*at least part of what the offer requests be performed or tendered*." And whatever was the effect of Mr. O'Connor sending Mr. deToledano his personal check for $5,000 14 months after the fact, it was not what was contemplated

by the original offer and could not have operated to revive the offer that Mr. deToledano had unconditionally repudiated.

Thus, arbitration should not be compelled, because there is no principled basis for finding that the parties ever entered into a valid agreement, including an agreement to arbitrate any disputes.

Secondly, the fact that Felt Sr. and Felt Jr. never signed the writing tendered by Mr. deToledano is fatal to defendants' contention on the separate ground that this failure to sign was apparently part of a scheme to obtain from Mr. deToledano, in essence, a cost-free "option" on his rights in <u>FBI Pyramid</u>, with no corresponding obligation on defendants' part, and no consideration. While the lack of signatures may, at first blush, seem unremarkable, upon a closer examination of the facts a clear picture of deliberate non-acceptance by the Felts emerges.

When a month had passed and Mr. deToledano had received neither an executed contract nor any payment, on December 6, 2003, he wrote O'Connor saying that he was canceling the "release" of his copyright. O'Connor, seeking to keep the deal alive, responded on December 15, 2003, asserting that "my client" expected to receive some money, and expected that he would be able to remit the $5,000.00 "by the first of the year, if that is alright."

At that time, the only client of O'Connor's of whom any performance was expected was Mark Felt, Jr.  *See* Ex. 4 ("*he* would pay you $5,000 in cash for your share of the rights. . ." referring to Felt Jr.)  As noted above, Felt Jr. was well-employed as a senior airline pilot for American Airlines, with substantial real estate holdings, and undoubtedly had access to the funds necessary to honor the proposed agreement.  It is apparent that Mr. O'Connor was misleading Mr. deToledano when he attempted to

create the appearance of a struggling family that was counting on receiving some money out of which the $5,000 would be paid (my client "thought he had some money coming in several weeks ago," December 15, 2003, Ex. 9).

Assuming, *arguendo*, that the proposed agreement was kept alive until "the first of the year" (2004) as O'Connor requested, January, February, and indeed all of 2004 passed, but no money was paid. And remarkably, although O'Connor and the Felts apparently desired to keep Mr. deToledano engaged during that period, no steps were taken during all of that time to provide Mr. deToledano with, at least, a fully executed agreement.

Mr. O'Connor is a sophisticated lawyer, who at all relevant times was a partner in a major law firm in San Francisco. While there may be a world in which sophisticated lawyers haphazardly leave to chance the signing of important written agreements, that is not the world of Mr. O'Connor or his law firm. Although the contract was in Mr. O'Connor's possession from November 2003 onward, it was not signed by any party except Mr. deToledano at any time up to and including the premature filing of the arbitration proceeding in San Francisco on May 10, 2006 (Ex. 10), nor at any time thereafter. There is no explanation in Mr. O'Connor's 22 paragraph declaration for why he never took the simple step of procuring the signatures of his two clients on the agreement, except that (1) he had Mr. deToledano's signature on the assignment of copyright, and (2) his clients did not wish to be bound to pay even $5,000.00 for that piece of paper. In *Commercial Factors Corp. v. Kurtzman Bros.*, 131 Cal. App. 2d 133, 280 P.2d 146 (1955), the California Court of Appeal struck down an arbitration clause, in part, because one of the parties to the putative agreement had failed to sign the contract.

14

The balance of 2004, and nearly two months of 2005, elapsed before anything was delivered to Mr. deToledano.  When a check for $5,000 was remitted, almost 16 months after Mr. deToledano had returned the signed writing and assignment of copyright, the check came not from the Felts, as contemplated by the contract, but from Mr. O'Connor's own *personal* checking account, a significant departure from what the contract envisioned.  Mr. O'Connor managed to keep his clients' involvement in the transaction as opaque and ambiguous as could be imagined.

In this case, there is no contract, and thus no agreement to submit disputes to arbitration.  Defendants insist that because deToledano signed a document containing an arbitration clause, he is bound to submit to arbitration even if the defendants themselves would not have been so bound.  It is apparent that defendants wanted to lock Mr. deToledano into the performance required by the proposed contract, and the aribtration clause, while remaining free of obligation themselves.

Third, the arbitration provision is a nullity because it was not openly or fairly entered into, and was itself procured by fraud.

2.  The Arbitration Provision Itself was Procured by Fraud.

Everyone who signs a contract is presumed to have read it.  Agreements to arbitrate, in order to be entitled to enforement, must be in writing.  If in writing, presumably a person who is capable of reading at all would see that an agreement makes reference to the arbitration of disputes.  What then is fraud in the procurement of an agreement to arbitrate?  The Court is presented squarely with this question in the case at bar, and the answer is clear: a fraudulently procured arbitration provision is one that is included under the guise that it is beneficial, when in fact it is calculated to undermine the rights of the other party.

Where an arbitration provision itself is procured by fraud, the issue of arbitrability is for the court to decide in the first instance, not an arbitrator.  If this principle, said to be the law by the Supreme Court and all lower courts that have considered the issue, is not to be a legal nullity, it must be given plain meaning.

The contract in issue here was negotiated between an experienced and sophisticated litigation attorney and an elderly person.  The litigator has practiced for his whole career in California; the elderly man lives in the District of Columbia, and has since 1956.  The elderly man is not a lawyer or a business man, and has been a party to only one arbitration, in the 1940s, which was expeditious and cost-free.  (deToledano Decl., ¶6.)

Mr. O'Connor, the litigator, has been in practice in San Francisco, California, since before the creation of an arbitration enterprise known as JAMS, now JAMS/Endispute, in 1979 (*see* http://www.jamsadr.com/welcome/welcome.asp).  He could not escape awareness of the advent of the arbitration industry, employing retired judges and lawyers at substantial hourly and daily rates.

Mr. O'Connor submitted to Mr. deToledano, then 87 years of age, a written proposal in which he inserted an arbitration provision.  The arbitration provision in that writing does not simply provide for arbitration, but specifically for arbitration before JAMS/Endispute in San Francisco.  The arbitration firm selected by O'Connor requires the parties to share the expense of the arbitrator, or "neutral," usually a retired judge, at rates as high as $600 per hour (*see* Ex. J), requires payment in advance of the estimated fees of the neutral, and in addition, and requires any lawyer who enters an appearance for a party responsible for the fees, including any additional fees that may be incurred, as though he or she were a party to the arbitration.  This all but forecloses

arbitration to any person who has budgetary limits, and forecloses any party from engaging a lawyer unless their ability to reimburse arbitration expenses can be guaranteed.

What, then, did O'Connor tell Mr. deToledano, about arbitration?  By his own admission, he told Mr. deToledano, in response to the latter's concerns about the difficulty of resolving disputes that might arise over the copyright royalty structure, that arbitration would take care of any such disputes.  In so saying, he could have intended nothing other than to allay concerns about the difficulty of applying the royalty formula, under the guise that arbitration would provide a relatively simple and efficient way to resolve the kind of dispute Mr. deToledano was worried about.  (deToledano Decl., ¶6.) He certainly would not have made such representations to raise concerns on Mr. deToledano's part.

The estimated deposit required by JAMS/Endispute for the arbitration proceeding itself, exclusive of attorneys' fees, other litigation costs, and travel, is over $7,000; the final cost could be much higher.  That amount is greater than the $5,000 consideration Mr. deToledano was to receive initially under the proposed agreement, is 20 times the cost of filing an action in federal court, and is beyond Mr. deToledano's ability to afford. (deToledano Decl., ¶ 7.)

O'Connor's statements concerning arbitration constituted a fraud going directly to the arbitration provision.  " 'Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated. If he speaks at all he must make a full and fair disclosure.'  Where there is a duty to disclose, the disclosure

must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action.' " *Pashley v. Pacific E. R. Co.*, 25 Cal. 2d 226, 235 (Cal. 1944). The court in *Pashley* continued, "Since its voluntary undertaking placed upon the defendant the duty to disclose to the plaintiff the full extent of his injuries and the probable future disability to be expected therefrom, its false representation . . . must be deemed to amount to fraud."

A party with sophisticated knowledge in an area of law or business is not privileged to make misleading or incomplete statements to a relatively less sophisticated party. *Cory v. Villa Properties*, 180 Cal. App. 3d 592, 597-598 (1986), citing *People v. Gordon*, 71 Cal. App. 2d 606, 163 P.2d 110 (1945).

Unquestionably, the duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff. *Borba v. Thomas*, 70 Cal. App. 3d 144, 154 (1977), citing 4 B. Witkin, Summary of Cal. Law (8th ed.) Torts, §462, pp. 2726-2727.

"In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead, (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." *Warner Constr. Corp. v. Los Angeles*, 2 Cal. 3d 285, 294 (1970), citing *Lingsch v. Savage,* 213 Cal. App. 2d 729, 735, 29 Cal.Rptr. 201, 8 A.L.R.3d 537 (1963); *Sime v. Malouf,* 95 Cal. App. 2d 82, 100, 212 P.2d 946, 213 P.2d 788 (1949); *Barder v. McClung*, 93 Cal. App. 2d 692, 697, 209 P.2d 808 (1949).

Fraud may be established where one party to a transaction has a duty to speak because that party possesses superior knowledge yet that party fails to state, or has no basis for, an asserted material fact. *Funk v. Sperry Corp.*, 842 F.2d 1129, 1134 (9th Cir. 1988) ("It is true that a duty to disclose can also arise when one party has superior knowledge, or uses half-truths to mislead another party," citing 4 B. Witkin, Summary of California Law §462, at 2726-28 (8th ed. 1974)).

This principle is nearly universal. *See Anderson v. Knox*, 297 F.2d 702, 727 (9th Cir. 1961), citing *Midstates Insurance Co. v. American Fidelity Cas. Ins. Co.,* 9 Cir., 234 F.2d 721, 729 (9th Cir. 1956) ("One who undertakes to make statements under circumstances such as this, is bound not only to state truly what he tells, but also not to suppress or conceal any facts within in his knowledge which materially qualify those statements. 'If he speaks at all he must make a full and fair disclosure,' applying Hawaiian law); *Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032, 1069-70, 109 Wn.2d 107, 166-167 (Wash. 1987), citing *Lincoln v. Keene*, 51 Wn.2d 171, 174, 316 P.2d 899 (1957); *U.S. Concord, Inc. v. Harris Graphics Corp.*, 757 F. Supp. 1053, 1057-1058 (D. Cal. 1991) (duty to disclose arises where one party possesses superior knowledge not readily available to the other and that party knows the other is acting on the basis of mistaken knowledge, applying New York law); *accord Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984); *Fairmont Foods Co. v. Skelly Oil Co.*, 616 S.W.2d 548, 550 (Mo. Ct. App. 1981) (the duty to disclose may arise from inequality of position . . . [or] superior knowledge on the part of one party that is not within the fair and reasonable reach of the other party); *accord, Modern Enters., Inc. v. Allen*, 802 F.2d 312, 313 (8th Cir. 1986).

It is no argument that a person in Mr. deToledano's position was placed on notice to conduct an investigation of the terms of the proposed arbitration provision.  A defrauded person "is not barred from maintaining an action merely because he commenced an investigation if it was incomplete or abandoned before discovery of the falsity, particularly if the defendant has a superior knowledge of the facts, or if it is difficult for the plaintiff to ascertain all the facts or he is not competent to judge the facts without expert assistance."  *Orient Handel v. United States Fid. & Guar. Co.*, 192 Cal. App. 3d 684, 694 (1987).

Further, Mr. O'Connor's statements concerning arbitration need not be assertions of fact to constitute actionable fraud.  Expressions of opinion, ordinarily not actionable, "when 'made under conditions which show that it was intended' by one uttering it 'to be treated as an immediate factor inducing action, and was made with knowledge that it would be accepted as a basis of action, instead of a mere element to be investigated before action . . . becomes for all practical purposes a statement of fact."  *McNabb v. Thomas*, 190 F.2d 608, 88 U.S. App. D.C. 379 (1951) ("In sum, the inexperience, naivete or ignorance of one of the parties, when contrasted with the superior knowledge or opportunity for knowledge of the other party, may make that actionable which would not be if the dealings were between more equally matched parties").

The fraud practiced on Mr. deToledano in this case was a direct procuring cause of the putative arbitration clause.  Had Mr. O'Connor spoken the truth about the arbitration clause, fairly and completely, the document that would now be before this Court would contain no such provision.  (deToledano Decl., ¶ 6.)  At no time did O'Connor hint at the meaning of an arbitration provision that purported to require submission of a dispute to "JAMS/Endispute," or that the cost of even initiating such a

proceeding could be many thousands of dollars (*id*.).  Thus, the question whether this dispute should be submitted to arbitration must be resolved by the Court, not summarily (deferring this issue to an arbitrator in the first instance) but based on the evidence, and on the merits of the issue.

3.  <u>The Arbitration Provision Cannot be Enforced Because it is Unconscionable</u>.

By a conservative estimate, the fees for a JAMS arbitration, separate and apart from legal fees and out-of-pocket costs, will likely exceed $15,000.00 per side.[6]  In addition, as should be obvious, Mr. deToledano is 90 years old, and for the past 50 years has resided in Washington, D.C., some 2,500 miles from the forum Mr. O'Connor selected.   Mr. deToledano now lives on a modest fixed income, and has no room in his monthly budget for expenses of the magnitude of the projected JAMS/Endispute fees. (deToledano Decl., ¶7.)

Making even a conservative estimate of the cost of proceeding before JAMS in California, O'Connor undoubtedly calculated that the costs and logistical burden of private arbitration would be enough to discourage Mr. deToledano from proceeding on the merits of the dispute at all.

JAMS requires that each party pay its pro rata share of fees according to a fee schedule, and that lawyers who appear are deemed to assume responsibility for such fees to the same extent as the party they represent.  The unavoidable effect of the latter provision is that parties, particularly those who cannot demonstrate the clear ability to pay JAMS' substantial fees, will be unable to obtain counsel.  Counsel for plaintiff in this

---

[6] It is estimated that any hearing on the merits would take approximately five days, at $6,000 per day: $30,000 for arbitrator's fees alone.  Mr. deToledano would call approximately five witnesses, and defendants, according to their motion, anticipate between five and ten.  In addition, several dozen exhibits would probably be introduced, including several hardcover nonfiction books.

matter unequivocally will not submit to the JAMS agreement and undertake responsibility for fees.[7]

An arbitration agreement may be invalidated on the ground that arbitration would be prohibitively expensive. *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 92 (2000). Excessive fees have been grounds for finding an arbitration provision unenforceable or commercially unreasonable, providing such a degree of substantive unconscionability as to invalidate an agreement to arbitration. *See, Gillman v Chase Manhattan Bank*, 73 NY2d, at 12; *State of New York v Wolowitz*, 96 A.D.2d 47, 68, 468 N.Y.S.2d 131 (1983); *accord Brower v. Gateway 2000*, 676 N.Y.S.2d 569, 574 (N.Y. App. Div. 1998) ("the excessive cost factor that is necessarily entailed in arbitrating before the ICC is unreasonable and surely serves to deter the individual consumer from invoking the process").

This Circuit has taken notice that the fees required to commence and conclude the instant dispute can be prohibitive. As reported in *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1481 n.8 (D.C. Cir. 1997):

> "AAA cites $700 per day as the average arbitrator's fee. Kenneth May, Labor Lawyers at ABA Session Debate Role of American Arbitration Association, DAILY LAB. REP. (BNA) No. 31, at A-12 (Feb. 15, 1996). JAMS/Endispute arbitrators charge an average of $400 per hour. See Alleyne, 13 HOFSTRA LAB. L.J. at 410 n.189. However, fees of $500 or $600 per hour are not uncommon. See Margaret A. Jacobs, Renting Justice: Retired Judges Seize Rising Role in

---

[7] The JAMS rules provide that parties may represent themselves, or be represented by "counsel or any other person" (Rule 9). This is impossible for Mr. deToledano, and also runs clearly afoul of the rules against the unauthorized practice of law in California. *See, e.g., Birbrower v. Superior Court*, 17 Cal.4th 117 (1998), holding that out-of-state lawyers could be subject to a charge of unauthorized practice of law for appearing in arbitration proceedings in California. California Civil Procedure Code Section 1282.4, enacted in response to this decision, provides only that an out-of-state attorney representing a party in arbitration did not engage in the unauthorized practice of law, if he or she timely filed a certificate and the attorney's appearance was approved by the arbitral forum. The rule makes no provision for representation by non-lawyers.

Settling Disputes in California, WALL ST. J., July 27, 1996, at A1; David Segal, Have Name Recognition, Will Mediate Disputes, WASH. POST, Dec. 16, 1996, Wash. Bus. at 5. CPR Institute for Dispute Resolution estimates arbitrators' fees of $250-$350 per hour and 15-40 hours of arbitrator time in a typical employment case, for total arbitrators' fees of $3,750 to $14,000 in an "average" case. See CPR Inst. For Dispute Resolution, Employment ADR: a Dispute Resolution Program for Corporate Employers I-13 (1995)."

In *Teleserve Sys., Inc. v. MCI Telecommunications Corp.*, 230 A.D.2d 585, 659 N.Y.S.2d 659 (N.Y. App. Div. 1997) the court held, "as a matter of law, the filing fee requirement is unreasonable, unjust, and unconscionable on its face and may not be enforced."  In that case, involving a damage claim for approximately $ 40,000,000 by one sophisticated corporate party against another, arbitration fees of $204,000 were deemed unconsionable.  Such fees are much smaller in proportion to the claim, resources, and sophistication of the claimant in *Teleserve* than the fees in the instant case.

The court described "the onerous filing fee" as rendering the contractual remedy of arbitration so "gravely difficult and inconvenient" as to be illusory.  *Teleserve*, at 594, citing *Mitsubishi Motors v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626, 632 (1985); *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972); *see, also, Spence v. Omnibus Indus.*, 44 Cal. App. 3d 970, 119 Cal. Rptr. 171 (1975) ($720 arbitration filing fee unenforceable); *Waggoner v. Dallaire*, 649 F.2d 1362, 1367 (9th Cir. 1981).

In *Rollins, Inc. v. Foster*, 991 F. Supp. 1426, 1437, the district court observed that where the costs of an arbitration proceeding effectively foreclosed one party from any remedy, a meritorious argument could be made for refusing to compel arbitration.  The Court reasoned:

"When a party who is in such an inferior bargaining position, as was Foster, is compelled to assert her claims in arbitration, thus precluding a remedy in the less expensive public fora, and the costs of the arbitral forum render the party unable

to pursue her claim, the clause is oppressive and one-sided and therefore unconscionable. To reach the opposite conclusion would permit more sophisticated business entities, such as Rollins and Orkin, to circumvent not only judicial, but also arbitral proceedings, thereby fully insulating themselves from complaints brought by lower-income consumers. It is this chilling effect that, in part, prompted the Seventh Circuit to conclude that an employee seeking enforcement of so-called 'statutory' rights in a compelled arbitration proceedings is not required to pay the arbitrators' fees" (citations omitted).

The Court in Rollins also recognized that "an arbitration filing fee may be so excessive that it can be considered unconscionable on its face."  991 F. Supp. at 1438 n.25.

State law generally determines the validity of any agreement to arbitrate. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995). State law also governs any law or equity defenses applicable to an arbitration agreement, so long as that law "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686-87, 134 L. Ed. 2d 902, 116 S. Ct. 1652 (1996) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 96 L. Ed. 2d 426, 107 S. Ct. 2520 (1987)). The F.A.A. preempts state laws that apply "only to arbitration provisions"–that is, that are not applicable to contracts generally–because they "directly conflict[]" with the Act's pro-arbitration mandate. See *id*. at 687-88.

While agreements to arbitrate are generally favored, California courts expect such agreements to be "openly and fairly entered into and [to] accomplish the purpose for which they are intended."  *Player v. Geo. M. Brewster & Son, Inc.*, 18 Cal. App. 3d 526, 96 Cal. Rptr. 149 (1971).  The laws promoting arbitration of disputes are not "enacted to provide a means of creating delay," (citing *Pneucrete Corp. v. U.S. Fid. & G. Co.*, 7 Cal. App. 2d 733, 740, 46 P.2d 1000 (1935), and thus "discourage subcontractors with possibly legitimate claims from urging such claims because of the

expense involved." *Id*.  In Player, the agreement was prepared wholly by the defendant, a New Jersey corporation, and the court observed that arbitration tended to advantage the defendant, in that strict observance of the arbitration clause "would require the plaintiffs to submit their cause to arbitrators the width of a continent away."  The court observed, also, that some decisions of California appeals courts evince "an inclination to limit the use of arbitration where the arbitration 'agreement' may give advantage to one party thereto," citing *Commercial Factors Corporation vs. Kurtzman Brothers*, 131 Cal. App. 2d 133 (1955).

As a related matter, if the threshold question of arbitrability were to be submitted to arbitration in the first instance, much of the case would be litigated in that forum, and at great expense, even if the arbitrator ultimately determined that the arbitration provision were unenforceable.  To submit the question of arbitrability *vel non* to the arbitrator, under the general fee schedule for JAMS arbitration, would be to require arbitration of much if not all of this dispute–unless, of course, the arbitrator were to find that the dispute is not arbitrable, in which case the parties will have been required to take part in a costly arbitration and then take their dispute to a court of competent jurisdiction.  *Kulukundis Shipping Co. v. Amtorg Trading Corp.*, 126 F.2d 978, 985-986 (2d Cir. 1942), involved similar circumstances, in which the parties would have been required to arbitrate the issues that went to the very essence of their dispute in order to determine whether the same issues were arbitrable.  The court observed:

> "As the arbitration clause here is an integral part of the charter party, the court, in determining that the parties agreed to that clause, must necessarily first have found that the charter party exists.  If the court here, having so found, were now to direct the arbitrators to consider that same issue, they would be traversing ground already covered in the court trial.  There would thus result precisely that needless expenditure of time and money (the "costliness and delays of litigation") which Congress sought to avoid in enacting the Arbitration Act.  In the light of

that fact, a reasonable interpretation of the Act compels a repudiation of appellant's sweeping contention," that all disputes including concerning the existence of a contract must be submitted in the first instance to arbitration.  [¶] . . .  "We conclude that it would be improper to submit to the arbitrators the issue of the making of the charter party."

Further, the JAMS arbitration rules that would apply in this case would, in and of themselves, impede or defeat plaintiff's efforts to present his claims.  The rules provide no mechanism for taking depositions, nor any assurance of full document production by the parties.  Procedures such as these are critical in a case in which the central issue is fraud by sophisticated business persons like Mr. O'Connor.  California law provides that these matters are within the discretion of the arbitrator.  C.C.P. §1283(e).

In *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83 (2000), the California Supreme Court found an arbitration agreement to be substantively unconscionable because, on another ground present in the instant case, it lacked mutuality.  24 Cal. 4th at pp. 115-116.  The court explained that "the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself."  *See also Kinney v. United Healthcare Services, Inc.*, 70 Cal. App. 4th 1322, 1325-26 (1999); *Stirlen v. Supercuts*, 51 Cal. App. 4th 1519, 1528-1529, 1542 (1997).

In sum, the cost, location, procedural limitations, and lack of mutuality, individually or in combination, compel a finding that the arbitration procedure specified in the contract documents is unconscionable, and should not be enforced.

4.  Arbitration Cannot Proceed According to JAMS's Own Rules

According to JAMS' own arbitration rules, an arbitration proceeding can be commenced only if (i) a post-dispute arbitration agreement is submitted–which has not occurred in this matter, and cannot; (ii) a pre-dispute written contractual arbitration

provision is submitted–which has not occurred in this case, and cannot, because defendants have never executed the proposed written agreement containing the arbitration provision; or (iii) an oral agreement to arbitrate confirmed in writing by the parties is submitted–which has not occurred in this case, and cannot, because there has never been an oral agreement concerning arbitration, nor does there exist any writing purporting to refer to or confirm such an agreement.  (*Cf.* arbitration rules at http://www.jamsadr.com.)

In sum, JAMS' initiation of an arbitration proceeding in this matter is *ultra vires* its own rules, and is in direct conflict with the true understandings of the parties, wholly apart from the fraud by which defendants induced plaintiff put his signature on the proposed Agreement to Assign Copyright, containing the JAMS arbitration provision.

5.  O'Connor Cannot Claim the Benefit of the Arbitration Provision.

Mr. O'Connor strains the credulity of the parties and the Court when he describes himself as a mere agent, doing the will of his principal, and later, as a "*pro bono* lawyer" when he authored a feature article in the national magazine *Vanity Fair.*  (In that article, O'Connor strains to minimize his personal commercial interests as he helps the family of W. Mark Felt, Sr. do honor to its patriarch, one of the heros of the Watergate era.)

While there might be cases in which an arbitration provision should be applied for the benefit of persons not expressly made parties to it, Mr. O'Connor's arguments here strain this principle beyond its breaking point.  The contract documents he drafted did not contemplate that he would be a party, and the mere act of drafting a purported contract cannot serve to elevate Mr. O'Connor's status from plain tortfeasor to that of *bona fide* agent of a contracting party.  Under no construction of the facts can O'Connor

claim the benefit of an arbitration clause which he drafted, and in which he did not expressly include himself.

In *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993), O'Connor's principal authority on this issue, the court was called upon to decide whether the buyer of a company was entitled to invoke the arbitration clause in a contract entered into by the company before he purchased it, and, thus, to which he was not a signatory. Despite having become an agent, officer and employee of the original contracting party contemporaneous with the events underlying the litigation, the court held that he was not entitled to compel arbitration, because he was neither a third party beneficiary nor successor in interest, and none of his allegedly wrongful acts arose out of or were related to the contract.

In *Britton*, following one appeal, "the district court, on remand, concluded that Liebling [the purchaser] lacked standing under the contract to assert a right to arbitrate." The court invoked general principles of arbitration law, that "the right to compel arbitration stems from a contractual right," (citing *Britton I*, 916 F.2d at 1413), and "that contractual right may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration," citing *Lorber Industries of California v. Los Angeles Printworks Corp.*, 803 F.2d 523, 525 (9th Cir. 1986); *E.E.O.C. v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1543, n. 2 (9th Cir. 1987) (an entity that is neither a party to nor agent for nor beneficiary of the contract lacks standing to compel arbitration).

The Court accepted Liebling's assertion "that he was an agent, officer and employee of GDL during the time period in which the plaintiffs' claims arose, but held that he was not, in those capacities, entitled to invoke the arbitration clause.  While

noting that the district court had been too narrow in its review of Liebling's activities as agent, the key question, according to the Court, was whether his "alleged wrongdoing as agent" related to or arose out of the contract containing the arbitration clause?" Finding that none of relevant acts charged against Liebling "seek to impose *liability from the contract*," (emphasis added) and the sum and substance of the allegations was "that he in some way attempted to defraud" the other parties to the contract, the court characterized the acts as "subsequent, independent acts of fraud, unrelated to any provision or interpretation of the contract," which would not "impose any contractual liability, vicariously or otherwise, upon Liebling."

Whatever might be the position of an agent conducting business in good faith on behalf of a principal, Mr. O'Connor was independent, acting in his own self-interest, and most importantly, was at all times in control of whether he, by name or by any other description, was to be included in the ambit of the arbitration clause. His bid to have the action as against him stayed pending arbitration should be rejected.

**D. <u>Well Established Principles of Venue Require that this Action be Tried in the District of Columbia</u>.**

Defendants must make two showings to justify transfer of venue under 28 U.S.C. §1404(a). First, they must establish that the plaintiff originally could have brought the action in the proposed transferee district. *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964); *United States v E. I. Du Pont De Nemours & Co.*, 83 F. Supp. 233 (D.D.C. 1949). Second, they must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to that court. *Trout Unlimited v. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996). A defendant bears the burden of demonstrating that the balance of convenience of the parties and witnesses and the interest of justice are in its favor. *Thayer/Patricof Educ. Funding LLC v. Pryor*

*Res.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002).  The plaintiff is permitted to choose any proper forum, and his choice is entitled to deference, and should not be lightly set aside. *Chicago, R. I. & P. R. Co. v. Igoe*, 220 F2d 299 (7th Cir.), *cert. denied* 350 U.S. 822, 100 L. Ed. 735, 76 S. Ct. 49 (1955); *see SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1154, 190 U.S. App. D.C. 252 (D.C. Cir. 1978).  The plaintiff's choice of forum is ordinarily afforded great deference.  *Id.* at 31; *see Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F. Supp. 525, 526 (D.D.C. 1987); *Butterick Co. v Will*, 316 F2d 111 (7th Cir. 1963); *Akers v Norfolk & W. R. Co.*, 378 F.2d 78 (4th Cir. 1967).

With respect to the first factor under Section 1404, it is by no means clear that venue for this action could properly have been laid in the Northern District of California. 28 U.S.C. §1391, governing general rules of venue, provides that "(b) a civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought."

Because the defendants do not all reside in the same state, the "substantial part of events" test is the only available basis for laying venue in this action.  And the District of Columbia would appear to be the only judicial district in which a substantial part of the events or omissions giving rise to the claim occurred: the FBI Pyramid was authored by Felt Sr. and Mr. deToledano here; all of the fraudulent conduct was directed to Mr. deToledano here (in person, and by letter, courier, and telephone); the contract

proposal and assignment were signed by Mr. deToledano here, and were never signed by any other party elsewhere. Some activity could be said to have taken place where Mr. O'Connor was when he initiated communications concerning Mr. deToledano, but deferring to the actions of the defendant who perpetrated a fraud on a local resident, as in this case, would exceed the bounds of fairness. Similarly, it could be argued that some activity may have taken place in Florida, where Felt Jr. resides. Ultimately, however, the action cannot be said to have arisen substantially in any district save this one.

In weighing considerations of convenience and the interest of justice, the Court should apply private and public interest considerations. Private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses . . . , but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

*Thayer/Patricof Educ. Funding LLC v. Pryor Res.*, 196 F. Supp. 2d 21, 31-32.

Ease of access to proof cannot seriously be considered to support transfer to the Northern District of California. Even where substantial evidence and other contacts with a competing forum are present, these factors must greatly outweigh those of the plaintiff's chosen forum in order to justify transfer. For example, in a case to enforce a contract for legal against a construction company relating to a California-based

construction contract, brought by a District of Columbia law firm, this court held that the connections to California were no more significant than those to the District of Columbia, and plaintiff's choice of forum therefore would not be disturbed.  *Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr. Ltd. Pshp.*, 24 F. Supp. 2d 66 (D.D.C. 1998).  Most of the proof in the instant case, to the extent it is not within the District of Columbia, is in electronic or document form, under the control of defendants, and its production can easily be compelled.

Similarly, any inconvenience to the defendants is more than outweighed by plaintiff's choice of forum, and the hardships plaintiff would experience litigating in California, were he physically able to travel there at all.  *See Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 50 (D.D.C. 2005) ("Kotan has not demonstrated any great hardship such as inability to travel, significant expense, or medical disability that would adversely affect his ability to litigate this case").  While defendants contend that Felt Sr. would have great difficulty traveling to the District of Columbia, it should be noted that he can have little if anything to contribute to the evidence given his limited memory of events; any hardship to Felt Sr. is necessarily outweighed by the hardship Mr. deToledano–now 90 and a *principal* witness in this action–would face in attempting to travel to California. Felt Jr., being an airline pilot residing in Florida, cannot claim that California is a more convenient forum, simply because he can visit his relatives while there for case proceedings.  Mr. O'Connor, for his part, now holds himself out nationally as a paid speaker on the subject of Watergate and the story of "Deep Throat."

When analyzing the convenience of witnesses, a defendant must show that witnesses would be unwilling to testify in the District of Columbia.  *Thayer/Patricof*, 196 F. Supp. 2d at 32.  This is a showing defendants have not made.  With respect to

possible witnesses in the publishing and film industries, there has been no suggestion

that those witnesses are necessary to the defense of this action, only a cursory

representation about the testimony they might give, and no representation that they

reside in or near the Northern District of California.  Kuhn Projects, LLC (the publisher or

representative of O'Connor and Felt Jr.) has its offices in New York City (Ex. C).  "To

support its request for transfer under section 1404(a), a moving party must demonstrate

. . .  what a non-resident witness will testify to, the importance of the testimony to the

issues in the case, and whether that witness is willing to travel to a foreign jurisdiction."

*Thayer/Patricof*, 196 F. Supp. 2d at 33.

In sum, defendants' motion falls woefully short of the showing required for a

transfer of venue under 28 U.S.C. §1404(a).

### E.  Conclusion

On the basis of the foregoing arguments and authorities, defendants' motions to

stay, or in the alternative to transfer venue, should be denied in their entirety.

Respectfully submitted,

Karr & Allison, P.C.


_____/s/_____
Theodore S. Allison (#441089)
1920 N Street, N.W., Suite 300
Washington, D.C.  20036
Telephone: (202) 331-7600

Attorneys for plaintiff