## Declaration of Ralph deToledano

I, Ralph deToledano, declare:

1. I am 90 years old, and a resident of Washington, D.C., where I have lived continuously for 50 years. I reside at 500 23rd St., N.W., No. 1010, Washington, D.C. All of the facts stated in this declaration are true, and within my personal knowledge.

2. I am the co-author of The FBI Pyramid from the Inside, in which I own a 50% copyright interest, along with W. Mark Felt, Sr. That interest, and the actions of the defendants to take my interest by fraud, are the main subjects of this lawsuit.

3. Attached to this declaration are true and authentic copies of (a) a letter I received from John O'Connor, dated February 18, 2005, and the enclosed check on Mr. O'Connor's personal bank account (Exhibit A); (b) a copy of the article, I'm The Guy They Called Deep Throat, which I read in the July, 2005 issue of *Vanity Fair* magazine (Exhibit B); and (c) two checks which I received from John O'Connor some time after he, the Felts and I were in conflict over the way in which they induced me to sign an assignment of my copyright interest in The FBI Pyramid from the Inside (Exhibit C).

4. I was 87 when I signed two documents concerning my copyright interest in The FBI Pyramid on or about November 4, 2003, and sent them to John O'Connor. As I had told Mr. O'Connor, I expected that any transfer of my copyright interest would be the subject of a formal contract, and I expected all of the parties to that contract to sign it. I have never received or seen, either in original or duplicate, a version of any writing concerning the transfer of my copyright interest bearing signatures of W. Mark Felt Sr., or W. Mark Felt Jr.

5. I returned the contract papers, and waited approximately a month, during which I made four attempts (by telephone and letter) to contact Mr. O'Connor about the contract papers

and required payment. When I did not receive word back from Mr. O'Connor, I realized that the Felts were not going to pay promptly as I had been told, and had not signed the contract papers. I wrote to Mr. O'Connor and told him that I was withdrawing my offer to transfer my copyright interest. Early in 2004, I received a call from W. Mark Felt, Jr., who told me he was having difficulty coming up with the money and asked me to reconsider. When I received a check from Mr. O'Connor, on his personal account, over a year later, I did not know who was using the copyright assignment I had signed, or for what purpose, nor did I understand why Mr. O'Connor himself was paying me.

6. During all of my communications with John O'Connor and W. Mark Felt Jr., during the years 2003 through 2005, I did not pay close attention to the paragraph about arbitration which Mr. O'Connor had included in the formal contract documents he sent me. I remember telling Mr. O'Connor that I had serious problems with the royalty structure he and Mark Felt Jr. had proposed, involving my receiving 33% for some uses of my copyrighted material, and only 10% for other uses; Mr. O'Connor told me, in a way that from his words and manner was intended reassure me and allay my fears, that either side could submit any dispute about the royalty structure to arbitration. What I knew about arbitration up to that point in my life was based on a single experience I had had in the 1940s, when I had a disagreement with a publisher and the two of us agreed to present our dispute to a neutral arbitrator, who charged nothing and gave us a decision very promptly. The amount in dispute was between $50 and $100. I had no inkling whatsoever that arbitration could be a complicated process involving days of hearings, costing the parties hundreds of dollars per hour just for the arbitrator's time, and I would never have agreed to such a procedure.

7. I cannot afford the JAMS/Endispute arbitration procedure, which, I am informed, is

one-half of $6,000 per day of work by the arbitrator, plus approximately 10% of the arbitrator's fees for administration by JAMS/Endispute. At 90 years of age, I live on a fixed income; I receive approximately $4,000 per month gross, between social security and my own retirement provisions. My rent is $1,890 per month, my food and incidentals are approximately $400 per month, in addition to which I pay for telephone, computer-related expenses, postage, publications, and other items. In the most recent calendar year, I had well over $8,000 in out-of-pocket medical expenses. After living expenses and taxes, I have little or no money left over.

8. I suffer from bone cancer and acute anemia, and my routine treatments consist of weekly injections and blood transfusions. In approximately the past three months, I have had three blood transfusions. I use a walker, and have significant difficulty moving from place to place. I cannot travel. My sister-in-law died recently, and I was unable to travel even to New York to attend her funeral, although I badly wanted to be there.

9. Referring this case to arbitration, or to court in California, would impose tremendous hardships on me, both logistically and financially.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on September 7, 2006, at Washington, District of Columbia.

_Ralph de Toledano_
Ralph deToledano