# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES TOLEDANO,
as personal representative of the Estate of
Ralph deToledano, et al.,

      Plaintiffs,

      v.

JOHN D. O'CONNOR, et al.,

      Defendants.

Civil Action No.  06-1214 (JDB)

## MEMORANDUM OPINION

In the July 2005 issue of Vanity Fair magazine, an article entitled "I'm the Guy They

Called Deep Throat" revealed for the first time the identity of the individual popularly known as

"Deep Throat" -- the confidential source who, in the 1970s, provided information to journalists

Bob Woodward and Carl Bernstein of The Washington Post in connection with their

investigation of the Watergate scandal.  The Vanity Fair article explained that the celebrated

informant was in fact Mark Felt, Sr., a career FBI agent who had long denied that he was Deep

Throat.  Felt Sr., along with his son Mark Felt, Jr. and John D. O'Connor, the author of the

Vanity Fair article, are defendants in this action.  They are being sued by the personal

representatives of the estate of Ralph deToledano, the co-author (with Felt Sr.) of The FBI

Pyramid from the Inside, a biography of Felt Sr. published in 1980.  The merits of this suit

concern the validity of a contract between deToledano and the Felts, entered into prior to the

revelation of Deep Throat's identity, that called for deToledano to transfer his 50% interest in the

copyright of <u>FBI Pyramid</u> to the Felts.  The contract further provided that any disputes related to the subject matter of the agreement would be referred to arbitration.

Now pending before the Court is a joint motion filed by Felt Sr. and O'Connor to stay this action pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16 (2000), and to transfer this action to the Northern District of California, and a motion filed by plaintiffs to stay arbitration proceedings.  For the reasons explained below, this Court concludes that Felt Jr. and Felt Sr. are entitled to a stay of this action under the FAA and that O'Connor is entitled to a discretionary stay.  Accordingly, defendants' motion to stay this action is granted in part and denied in part, and plaintiffs' motion to stay arbitration is denied.  The Court also denies defendants' motion to transfer venue.  It is worth emphasizing that the only issue currently before the Court is whether this dispute must be arbitrated.  Thus, the Court expresses no opinion on the underlying merits of plaintiffs' claims, which will be addressed by an arbitrator in the first instance.

## BACKGROUND

In 1980, G.P. Putnam's Sons published <u>The FBI Pyramid from the Inside</u>, a biographical account (now out of print) of the long-time FBI career of defendant Mark Felt, Sr. ("Felt Sr."). <u>See</u> Compl. ¶ 8, Decl. of Theodore S. Allison ("Allison Decl.") Ex. D.  Although the title page lists the sole author of the book as W. Mark Felt, in fact Ralph deToledano was Felt's co-author and, at least at the time of the book's publication, owner of a 50% undivided interest in the corresponding copyright.  Compl. ¶ 8, Allison Decl. Ex. D.

In early 2003, defendant Mark Felt, Jr. ("Felt Jr.") contacted deToledano about <u>FBI Pyramid</u> in order to obtain deToledano's copyright interest in the book.  Felt Jr. hoped to release a

new book about his father that incorporated information from the previous biography.  Compl.
¶ 14, Declaration of John D. O'Connor ("O'Connor Decl.") Ex. 1 (May 9, 2003, Letter and
Revised Agreement) at 2; see also Felt Jr. Answer ¶ 14.  Under Felt Jr.'s initial offer, as described
in the complaint, Felt Jr. would have paid deToledano an amount equal to either 33% of the net
royalties for the publication of a book that substantially used material from FBI Pyramid, or an
amount equal to 10% of the net royalties for any publication about Felt Sr. that did not derive
substantially from FBI Pyramid.  Compl. ¶ 14.

     The subsequent discourse between deToledano and defendants with respect to a transfer
of the FBI Pyramid copyright took place primarily through an exchange of letters, the contents of
which are not in dispute.  The first of these letters was sent from O'Connor to deToledano on
May 9, 2003.  May 9, 2003, Letter and Revised Agreement at 1.  Plaintiffs allege that O'Connor
wrote the letter as a "literary agent for the Felt family" and "did not disclose that he was acting as
a lawyer, nor that he had any personal or financial interest in authoring, promoting or licensing
the story of Felt Sr."  Compl. ¶ 15.  In the letter, O'Connor responded to deToledano's apparent
confusion over the proposed two-tiered royalty payment structure, stating that "if the parties
disagreed as to whether the final version entitled you to 10% or 33%, either party would have the
right to go to arbitration."  May 9, 2003, Letter and Revised Agreement at 1.  O'Connor enclosed
with the letter a copy of "a revised version of the Agreement to Assign Copyright."  Id.  That
version of the agreement contained a paragraph detailing the two-tiered royalty payment
schedule, as well an arbitration provision calling for "a confidential arbitration before a single
arbitrator before JAMS/ENDISPUTE" in San Francisco "[s]hould there arise any dispute under
this Agreement, or in any way related to the subject matter of this Agreement."  Id. at 3-4.

On May 27, 2003, deToledano responded with a letter to O'Connor in which he wrote that the "Agreement to Assign Copyright bears no resemblance to what I discussed with Mark Felt Jr." O'Connor Decl. Ex. 3 (May 27, 2003 Letter). Instead, deToledano wrote, he had "discussed a re-publication of [FBI Pyramid] with perhaps some added material to be supplied by Mark Sr., with a three-way split of the royalties and copyright," and, on that basis, he also had "offered to do any work on the new book that a publisher might require." Id. deToledano then observed that "[t]he agreement which you were to draw up, I believed, would incorporate the above. What you submitted leaves me out, except for a possible 10% of royalties." Id.

According to O'Connor, he and deToledano communicated once by telephone in the months after his receipt of deToledano's May 27, 2003, letter. O'Connor Decl. ¶ 8. During that conversation, O'Connor "mentioned that if there were disagreements about whether the 10% or 33% [royalty rate] was applicable, the arbitration clause would resolve any disputes." Id. O'Connor states that other than that telephone call, "there was no communication whatsoever orally regarding the arbitration clause, but in that conversation, [O'Connor] did point out the existence of the clause, and Mr. deToledano acknowledged that he knew there was an arbitration clause in the proposed Agreement." Id.

O'Connor then sent a letter to deToledano on September 2, 2003, writing that "Mark Jr. would still like to try to do a book" and suggesting that deToledano had misunderstood the last offer, "which was that you got 10% if we did not use any of the copywrighted [sic] materials, but gave you the 33% if Mark Jr. used them." O'Connor Decl. Ex. 4 (Sept. 2, 2003 Letter). The letter continued:

> In any case, he suggests we do it even more simply. He would pay you

-4-

> $5,000 in cash for your share of the rights, plus $5,000 if he ever gets a book published.  Please let us know what you think about that offer, which would make this whole thing much simpler.

Id.  As a postscript, O'Connor wrote that Felt Jr. would "still like to consider [deToledano] as a

ghostwriter for an additional negotiated fee."  Id.

deToledano wrote back on September 7, 2003, thanking O'Connor for the letter of

September 2.  See O'Connor Decl. Ex. 5 (Sept. 7, 2003 Letter).  The letter continued:

> I accept Mark's proposal as outlined in your letter.  As I understand it, he will pay me $5,000 in cash for my share of the rights in The FBI Pyramid, with an additional $5,000 if the revised edition is published.  I presume that on receipt of my letter, you will draw up and send me a formal contract embodying his proposal.

Id.  deToledano also offered his help with editing or incorporating material into the new book for

an additional fee, noting that there would be "no problem arriving at an equitable arrangement."

See id.

The next letter was sent from O'Connor to deToledano on October 27, 2003, and reads in

relevant part:

> Enclosed is an Agreement to Assign Copyright and Assignment of Copyright for your execution.  Please execute the Agreement and the Assignment, keeping copies for yourself, and send a signed copy of each in the enclosed self-addressed stamped envelope.  We will forward you a check for $5,000 upon your execution of this contract, and after you have received that amount, you can then send us back an executed copy of the Assignment.

O'Connor Decl. Ex. 6 (Oct. 27, 2003 Letter) at 1.  Enclosed with the letter were a two-page

Agreement to Assign Copyright and a one-page Assignment of Copyright. See id. at 2-4.  The

Agreement included the following arbitration clause:

> Should there arise any dispute under this Agreement, or in any way related to the subject matter of this Agreement, the parties agree to a confidential arbitration before a single arbitrator before JAMS/ENDISPUTE, San Francisco, California,

under its applicable rules for arbitration.  The Arbitrator hereunder shall decide any questions of venue or location for hearing, deposition, or the taking of any evidence.  All arbitration proceedings shall be kept strictly confidential.

Id. at 3 ¶ 7.

Both the Agreement and the Assignment were signed by deToledano on November 4, 2003.  See O'Connor Decl. Ex. 7.  In a declaration submitted to this Court, deToledano stated that he sent the signed Agreement and Assignment to O'Connor, and he "expected that any transfer of my copyright interest would be the subject of a formal contract, and [he] expected all of the parties to that contract to sign it."  Decl. of Ralph deToledano ¶ 4.

Approximately one month after signing the Agreement and Assignment, deToledano wrote to O'Connor again.  See O'Connor Decl. Ex. 8 (Dec. 6, 2003 Letter).  His letter stated:

> Release to Mark Felt Jr. of my 50 percent of the copyright of The FBI Pyramid was contingent on payment by you of $5,000, plus $5,000 on any use by Mark Felt Jr. of the text and material of said book.
> Though weeks have passed, I have not received the check for $5,000, as specified by our agreement.
> This is to inform you that, because of your failure to make payment to me as provided for in our agreement, I am canceling that release.

Id.  When O'Connor wrote back on December 15, 2003, he "apologize[d] for [his] client, who thought he had some money coming in several weeks ago" and indicated that "we do expect to be able to pay you by the first of the year."  O'Connor Decl. Ex. 9.

Over one year later, O'Connor wrote to deToledano again:  "Enclosed is a check for $5,000 as payment for the rights to any and all copyright interest you have in The FBI Pyramid, previously transferred to our clients.  Please excuse the delay."  Decl. of Ralph deToledano Ex. A (Feb. 18, 2005 Letter & Check).  The enclosed check was drawn from O'Connor's personal account.  See id.  In his declaration, deToledano claims that "[w]hen [h]e received a check from

Mr. O'Connor, on his personal account . . . [he] did not know who was using the copyright assignment [he] had signed, or for what purpose, nor did [he] understand why Mr. O'Connor himself was paying [him]."  deToledano Decl. ¶ 5.  The check was negotiated by deToledano on March 2, 2005.  Defs.' Ex. 12.

On or about May 31, 2005, deToledano and the general public learned for the first time that Felt Sr. was the individual known as "Deep Throat" -- the "confidential informer . . . who helped The Washington Post unravel the mysteries of the Watergate break-in and cover-up by Richard M. Nixon's White House."  Compl. ¶¶ 10, 11.  This revelation was contained in an article written by O'Connor for the July 2005 issue of Vanity Fair magazine.  See deToledano Decl. Ex. B ("I'm the Guy They Called Deep Throat").  Plaintiffs allege that Felt Sr.'s identity as Deep Throat had been known to Felt Jr. and O'Connor for several years.  Compl. ¶ 11.  Plaintiffs also allege that O'Connor told the Wall Street Journal in mid-2005 that he was entertaining book and movie proposals based on Felt's identity as Deep Throat; the book rights alone were worth an estimated $1,000,000, according to a Fox News report.  Id. ¶ 20.

Neither the complaint nor the documents filed in connection with the parties' pending motions explain what transpired between the parties in the year following the revelation of Felt Sr.'s role as Deep Throat.  However, deToledano received a final letter from O'Connor on May 1, 2006, which stated:  "Enclosed are checks totaling $5,000 per the contract."  deToledano Decl. Ex. C.  That letter included a check for $4,250 from the account of Kuhn Projects, LLC, and another check for $750 from O'Connor's personal bank account.  deToledano Decl. Ex. C. Plaintiff alleges that Kuhn Projects acted "as O'Connor's representative (with Felt Jr.) as author of a book entitled A G-Man's Life, the putative rewrite of The FBI Pyramid."  Compl. ¶ 22.

On May 10, 2006, Felt Sr., via O'Connor, filed a demand for arbitration before JAMS in San Francisco concerning the dispute that had arisen between Felt Sr. and deToledano over ownership of the copyright to FBI Pyramid.  O'Connor Decl. ¶ 11, id. Ex. 10.  JAMS issued a notice of the commencement of arbitration on June 27, 2006.  Id. Ex. 11.  On July 3, 2006, deToledano filed this action in this court against defendants O'Connor, Felt Jr., and Felt Sr.  In light of deToledano's death on February 3, 2007, deToledano's sons, James Toledano and Paul Toledano, acting as personal representatives of their father's estate, have filed a motion pursuant to Rule 25 of the Federal Rules of Civil Procedure to substitute themselves as plaintiffs.  The motion to substitute, which is unopposed, is granted in an accompanying order.

The complaint in this action asserts common-law claims of fraud and constructive fraud, as well as claims of copyright infringement and copyright conversion under the federal Copyright Act, see 17 U.S.C. §§ 501 et seq.  Plaintiffs also request rescission of both the Agreement and the Assignment, as well as a declaratory judgment stating that deToledano (or, presumably, now his estate) is the owner of a 50% interest in the copyright to FBI Pyramid.  Felt Jr. filed an answer to the complaint on August 31, 2006.  O'Connor and Felt Sr. have jointly moved for a stay of this action pending arbitration and have also requested that the action be transferred to the Northern District of California.  Plaintiffs have responded with a motion to stay the arbitration.

## STANDARD OF REVIEW

When considering "a motion to stay proceedings and/or compel arbitration, the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions" pursuant to Federal Rule of Civil Procedure 56(c).  Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 67 (D.D.C. 2003) (internal quotation marks

omitted); <u>see also</u> <u>Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.</u>, 636 F.2d 51, 54 & n.9 (3d Cir. 1980).  Thus, it is appropriate to grant a motion to stay proceedings when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking a stay of proceedings bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Id.</u> (quoting Fed. R. Civ. P. 56(c)).

   In determining whether there exists a genuine issue of material fact sufficient to defeat the motion to stay, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>see also</u> <u>Par-Knit Mills, Inc.</u>, 636 F.2d at 54 ("The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.").  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. <u>Anderson</u>, 477 U.S. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on its motion for a stay.  <u>Cf.</u> <u>Celotex</u>, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if

the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

### I.    Defendants' Motion to Stay Proceedings Pending Arbitration

Defendants invoke the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. §§ 1-16 (2000), to ask for a stay of proceedings in this action pending arbitration of plaintiff's claims. In passing the FAA, Congress sought "to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). Accordingly, the FAA dictates that an agreement to arbitrate in any "contract evidencing a transaction involving commerce" is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act further provides that a district court, "upon being satisfied that the issue involved in [a] suit or proceeding is referable" to arbitration, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." Id. § 3.

Before this Court can be satisfied that the issues in this action are referable to arbitration, it must first consider plaintiffs' challenges to the validity of the arbitration agreement. See, e.g., Stromberg Sheet Metal Works, Inc. v. Wash. Gas Energy Sys., Inc., 448 F. Supp. 2d 64, 68 (D.D.C. 2006). "An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law, 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987) (citation omitted) (quoting § 2). The Supreme Court has clarified that state law, either in statutory or common-law form, can operate to invalidate an arbitration agreement under § 2 so long as "that law arose to govern issues

concerning the validity, revocability, and enforceability of contracts generally." Doctor's

Assocs., Inc. v. Casarotto, 517 U.S. 681, 686-87 (1996) (quoting Perry, 482 U.S. at 493 n.9).

Thus, arbitration agreements can be rendered unenforceable on the basis of "generally applicable

contract defenses, such as fraud, duress, or unconscionability." Id. at 687; see also Mitsubishi

Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627 (1985) ("[C]ourts should

remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of

fraud or overwhelming economic power that would provide grounds 'for the revocation of any

contract.'").  The parties agree that, to the extent that state-law contract principles are relevant to

plaintiffs' challenges to the arbitration agreement, this Court should look to the law of California.

     Plaintiffs contest the validity of the arbitration agreement on a number of grounds.  First,

they argue that no contract ever existed between the parties because deToledano withdrew his

offer to enter into a contract with the Felts before they had accepted his offer, or, alternatively,

because the Felts never signed the Agreement.  Second, plaintiffs argue that the arbitration

agreement is unenforceable because it was procured by fraud -- they allege that O'Connor

induced deToledano to agree to the arbitration provision by misleading him about the nature and

cost of arbitration.  Third, plaintiffs argue that the arbitration agreement is unconscionable under

California law.  Fourth, they argue that the arbitration provision is unenforceable under federal

and state law because arbitration would be prohibitively expensive.  Finally, plaintiffs argue that,

even if the arbitration agreement is enforceable, O'Connor is not entitled to a stay of this action in

any event because he was never a party to the underlying contract.

     As a preliminary matter, this Court must ensure that it has the authority to resolve each of

these issues; the Supreme Court has recently reaffirmed that certain challenges to an arbitration

agreement must be referred to arbitration in the first instance.  In Buckeye Check Cashing, Inc. v.

Cardegna, 546 U.S. 440 (2006), the Court noted that "[c]hallenges to the validity of arbitration

agreements . . . can be divided into two types."  Id. at 444.  The first type, which "challenges

specifically the validity of the agreement to arbitrate," may be adjudicated by the district court.

Id.  But the FAA does not permit a district court to consider the second type, which consists of

"challenges [to] the contract as a whole, either on a ground that directly affects the entire

agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of

one of the contract's provisions renders the whole contract invalid."  Id.; see also Prima Paint

Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 (1967) ("[I]n passing upon a § 3

application for a stay while the parties arbitrate, a federal court may consider only issues relating

to the making and performance of the agreement to arbitrate.").

Most of plaintiffs' challenges to the arbitration agreement clearly fall within the first

category of claims that can be heard by the district court.  In particular, this Court may consider

whether the arbitration provision itself (as distinct from the contract as a whole) was procured by

fraud, is unconscionable, or is unenforceable based on prohibitive arbitration costs.  It is also for

this Court to determine whether the parties seeking a stay under the FAA are also parties to the

arbitration agreement.  See, e.g., DSMC Inc. v. Convera Corp., 349 F.3d 679, 685 (D.C. Cir.

2003).  Defendants contend, however, that only an arbitrator may consider the question whether

the parties successfully entered into a contract because that challenge goes to the validity of the

contract as a whole.  The Court disagrees.

Although the Supreme Court in Buckeye Check Cashing confirmed that "a challenge to

the validity of the contract as a whole, and not specifically to the arbitration clause, must go to

-12-

the arbitrator," 546 U.S. at 449 (emphasis added),[1] it also noted that "[t]he issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded," id. at 444 n.1.  And the Court further emphasized that its opinion "addresses only the former, and does not speak to the issue decided in cases . . . which hold that it is for the courts to decide whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent."  Id. (citations omitted).[2]  It is this latter set of issues, carved out of Buckeye Check Cashing's broader holding -- i.e., disputes over whether a contract existed at all -- to which plaintiff's first challenge belongs.

Unlike other circuits, the D.C. Circuit has never had occasion to consider the propriety of district-court adjudication of challenges to the formation of a contract containing an arbitration

---

[1]Underlying this holding is a principle referred to by the Court as "Prima Paint's rule of severability."  See 546 U.S. at 446, 447.  Prima Paint established that, as a matter of federal law, an arbitration clause is "enforceable apart from the remainder of the contract," id. at 446, even though that contract might later be found voidable or void by the arbitrator, see id. at 448.

[2]There may be some tension between cases cited by the Supreme Court in its footnote in Buckeye Check Cashing (at least those cases which purport to distinguish between void and voidable contracts, see Spahr v. Secco, 330 F.3d 1266, 1272 n.7 (10th Cir. 2003) (listing cases); Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 107 (3rd Cir. 2000)), and the Court's holding in the body of its opinion that, for purposes of Prima Paint's severability principle, courts should not distinguish between contracts that are void and those that are merely voidable, 546 U.S. at 448. See, e.g., Bar-Ayal v. Time Warner Cable Inc., No. 03-cv-9905, 2006 WL 2990032, at *6 & n.14 (S.D.N.Y. Oct. 16, 2006) (describing and reconciling this apparent tension).  This Court need not address the issue further because deToledano's challenge goes to whether the contract existed in the first place and is not an argument that the contract is void.  See, e.g., Chastain v. Robinson-Humphrey Co., 957 F.2d 851, 855 (11th Cir. 1992) ("Prima Paint has never been extended to require arbitrators to adjudicate a party's contention, supported by substantial evidence, that a contract never existed at all."), cited in Buckeye Check Cashing, 546 U.S. at 444 n.1; see also, e.g., Large v. Conseco Fin. Servicing Corp., 292 F.3d 49, 53 (1st Cir. 2002) (reviewing cases "involving allegations that the contract with the arbitration clause never existed").

provision (as opposed to challenges to the formation of the arbitration provision itself).  This circuit has, however, long treated "disputes over the formation of an agreement to arbitrate -- i.e., whether the parties ever agreed to submit anything to arbitration in the first place" -- as properly before the district court.  Nat'l R.R. Passenger Corp. v. Boston & Me. Corp., 850 F.2d 756, 761 (D.C. Cir. 1988); see also, e.g., Bailey v. Fed. Nat'l Mortgage Ass'n, 209 F.3d 740, 746-47 (D.C. Cir. 2000) (finding no mutual assent to arbitration policy).  Furthermore, the D.C. Circuit in Nat'l R.R. Passenger Corp. cited with approval cases from other circuits that assessed the existence of the underlying contract as a whole.  See 850 F.2d at 761 (citing A.T. Massey Coal Co. v. Int'l Union, United Mine Workers of Am., 799 F.2d 142 (4th Cir. 1986), and Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51 (3d Cir. 1980)).  Those circuits in turn relied upon the established proposition that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT&T Techs., Inc. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (internal quotation marks omitted); see A.T. Massey Coal Co., 799 F.2d at 146; Par-Knit Mills, Inc., 636 F.2d at 54; see also, e.g., Air Line Pilots Ass'n v. Fed. Express Corp., 402 F.3d 1245, 1248 (D.C. Cir. 2005).  Hence, a party that contests its assent to a contract containing an arbitration provision should not be required to submit to arbitration until the court determines that an agreement in fact existed.  See, e.g., Sphere Drake Ins. Ltd. v. All Am. Ins. Co., 256 F.3d 587, 591 (7th Cir. 2001) ("[A]s arbitration depends on a valid contract[,] an argument that the contract does not exist can't logically be resolved by the arbitrator . . . ."); Par-Knit Mills, Inc., 636 F.2d at 55 ("A party may, in an effort to avoid arbitration, contend that it did not intend to enter into the agreement which contained an arbitration clause.").

The district court is therefore the appropriate forum for adjudicating all of plaintiffs'
challenges -- to the arbitration provision, to enforcement of that provision, and to the existence of
the contract containing that provision.  This Court will consider each challenge in turn.

### A.    Existence of an Agreement

Plaintiffs argue that deToledano never agreed to arbitrate any dispute concerning the
copyright in FBI Pyramid because no contract between deToledano and the Felts ever existed in
the first place.  They characterize deToledano's signing of the Agreement and Assignment on
November 4, 2003, as an offer to enter into a contract with the Felts -- an offer that, they submit,
deToledano revoked in his letter of December 6, 2003, which stated that he was "canceling" the
Assignment because he had not yet received the $5000 payment from defendants.  See Pl.'s
Opp'n to Defs.' Mot. to Stay Action Pending Arbitration ("Pl.'s Opp'n") at 12.  Defendants
respond that deToledano's act of sending them a signed copy of the Agreement actually
constituted acceptance by performance (acceptance of what, they do not explain).  See Defs.'
Reply in Support of Mot. to Stay and to Transfer Venue ("Defs.' Reply") at 4.  The Court finds
instead that deToledano's actions in forwarding a signed copy of the Agreement represented
performance on a contract that had already been concluded when deToledano sent his earlier
letter to O'Connor on September 7, 2003, accepting defendants' offer of September 2, 2003.

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify
another person in understanding that his assent to that bargain is invited and will conclude it."
Donovan v. RRL Corp., 27 P.3d 702, 709 (Cal. 2001); Restatement (Second) of Contracts § 24
(1981).  The court must consider "all the surrounding circumstances" when determining "whether
a particular communication constitutes an operative offer, rather than an inoperative step in the

preliminary negotiation of a contract." <u>Donovan</u>, 27 P.3d at 709.  In turn, "[a]cceptance of an

offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or

required by the offer."  Restatement (Second) of Contracts § 50(a); <u>see also</u> <u>Donovan</u>, 27 P.3d at

709 (describing mutual assent).  The existence of mutual assent "is determined under an

objective standard applied to the outward manifestations or expressions of the parties, i.e., the

reasonable meaning of their words and acts, and not their unexpressed intentions or

understandings." <u>Alexander v. Codemasters Group Ltd.</u>, 127 Cal. Rptr. 2d 145, 152 (Cal. Ct.

App. 2002); <u>see also</u> <u>Donovan</u>, 27 P.3d at 709 (noting that "objective manifestation of the party's

assent ordinarily controls").

The relevant outward expressions of the parties here demonstrate that a contract was

formed on September 7, 2003.  At least one preliminary draft of the Agreement and Assignment

had been circulated to deToledano prior to September 2003.  <u>See</u> May 9, 2003, Letter and

Revised Agreement.  After negotiations apparently broke down over the two-tier royalty

payments that defendants originally proposed, O'Connor sent deToledano a letter on September

2, 2003, suggesting that, instead of royalties, deToledano accept two lump-sum payments of

$5000.  <u>See</u> Sept. 2, 2003 Letter.  O'Connor also asked deToledano to "let us know what you

think about that offer." <u>Id.</u>  Subsequently, deToledano wrote back: "I accept Mark's proposal as

outlined in your letter. . . . I presume that on receipt of my letter, you will draw up and send me a

formal contract embodying his proposal."  Sept. 7, 2003 Letter.  At this point in time, mutual

assent was present.  The parties had agreed upon all of the material terms in the contract -- the

Felts would pay deToledano $5000 in exchange for the Assignment and an additional $5000 if a

new book about Felt Sr. were published.[3]  See Bustamante v. Intuit, Inc., 45 Cal. Rptr. 3d 692,

699 (Cal. Ct. App. 2006) ("Under California law, a contract will be enforced if it is sufficiently

definite . . . for the court to ascertain the parties' obligations and to determine whether those

obligations have been performed or breached.").

    Plaintiffs argue that the lack of a signature on the Agreement by either Felt is fatal to

mutual assent because deToledano "expected all of the parties to that contract to sign it."

deToledano Decl. ¶ 4.  Of course, regardless of what deToledano might subjectively have

believed, California law looks only to "objective manifestations of intent."  Bustamante, 45 Cal.

Rptr. 3d at 703 (internal quotation marks omitted).  Plaintiffs rely on the principle that "where it

is part of the understanding between the parties that the terms of their contract are to be reduced

to writing and signed by the parties, the assent to its terms must be evidenced in the manner

agreed upon or it does not become a binding or completed contract."  Beck v. Am. Health Group

Int'l, Inc., 260 Cal. Rptr. 237, 241 (Cal. Ct. App. 1989).  On the other hand, it is also black-letter

law that "[m]anifestations of assent that are in themselves sufficient to conclude a contract will

not be prevented from so operating by the fact that the parties also manifest an intention to

prepare and adopt a written memorial thereof."  Restatement (Second) of Contracts § 27; see also

Rennick v. O.P.T.I.O.N. Care, Inc.,77 F.3d 309, 313-14 (9th Cir. 1996) (same); Columbia

Pictures Corp. v. De Toth, 197 P.2d 580, 585 (Cal. Ct. App. 1948) (same).  Thus, it is possible to

"make a contract the terms of which include an obligation to execute subsequently a final writing

---

[3]Indeed, deToledano's December 2003 letter, which plaintiffs now attempt to characterize
as the revocation of an offer, reads more like an expression of frustration over defendants'
apparent breach of a contract already in existence.  See Dec. 6, 2003 Letter ("Though weeks have
passed, I have not received the check for $5,000, as specified by our agreement." (emphasis
added)).

which shall contain certain provisions.  If parties have definitely agreed that they will do so, and

that the final writing shall contain these provisions and no others, they have then concluded the

contract."  Restatement (Second) of Contracts § 27 cmt. a; see also Harris v. Rudin, Richman &

Appel, 87 Cal. Rptr. 2d 822, 828 (Cal. Ct. App. 1999) ("Where the writing at issue shows 'no

more than an intent to further reduce the informal writing to a more formal one' the failure to

follow it with a more formal writing does not negate the existence of the prior contract." (quoting

Smissaert v. Chiodo, 330 P.2d 98, 100 (Cal. Ct. App. 1958))).  The court must look to the

surrounding circumstances to determine whether communications between parties are

preliminary negotiations rather than an agreement.  See Columbia Pictures Corp., 197 P.2d at

586.

     Here, the evidence is unambiguous that deToledano expressed no more than a desire to

reduce an already-formed agreement to a more formal writing.  Plaintiffs emphasize

deToledano's comment that:  "I presume that on receipt of my letter, you will draw up and send

me a formal contract embodying this proposal."  Sept. 7, 2003 Letter.  But in that same letter,

deToledano also wrote: "I accept Mark's proposal as outlined in your letter."  This statement is

unequivocal.  The acceptance by deToledano of defendants' offer was not conditioned on a fully

executed formal writing, even though he may have expected one to follow.  The presumption

expressed by deToledano that O'Connor would formalize the agreement in a later writing thus

differs in kind from statements that in other cases indicated that the parties were still in

preliminary negotiations.[4]  For example, the writings in Beck included references to "the outline

---

[4]This statement also differs in kind from deToledano's statements in the same letter
concerning the possibility of editing the new book, which are preliminary negotiations -- "I am
ready to give any help needed towards the production of a revised MS. Is [sic] this means simply

of our future agreement" and stated that "[w]hen we have a draft, we will discuss it, and hopefully shall have a completed contract and operating unit in the very near future."  260 Cal. Rptr. at 242.  Likewise, the documents at issue in the sole case cited by plaintiffs, Commercial Factors Corp. v. Kurtzman Bros., 280 P.2d 146 (Cal. Ct. App. 1955), "each contained the provision: 'This order becomes a contract only when signed by the seller or confirmed in writing by the seller.'"  Id. at 146 (emphasis added).  In those cases, unlike here, the parties' objective manifestations of intent demonstrated an understanding that a further writing was a prerequisite to an operative contract.

Plaintiffs also contend more generally that the lack of a signature on the Agreement by either Felt was fatal to the formation of the contract.  Partly, this argument is based on plaintiffs' belief that the Felts purposefully neglected to sign the contract in order to create a "cost-free 'option' on [deToledano's] rights in FBI Pyramid."  Pl.'s Opp'n at 13.  In other words, they suggest that once defendants received the signed Assignment from deToledano (which, under the procedures suggested in O'Connor's October 27, 2003 letter, deToledano was expected to send after receipt of the first $5000, see Oct. 27, 2003 Letter at 1), the Felts "did not wish to be bound to pay even $5,000.00 for that piece of paper," Pl.'s Opp'n at 14.  Of course, deToledano eventually received a check for $5000, which he then negotiated.  More to the point, defendants' subjective motives for not signing the contract are irrelevant to the question whether the lack of a signature precluded the formation of an agreement, and there is simply no general requirement under California law that all parties must sign an agreement before a contract is formed.  See,

professional editing, any fee would be minimal.  If it means incorporating additional material . . ., I am sure there will be no problem at arriving at an equitable arrangement."  Sept. 7, 2003 Letter.

e.g., E.O.C. Ord, Inc. v. Kovakovich, 246 Cal. Rptr. 456, 459 (Cal. Ct. App. 1988) ("It is well

established that the receipt and acceptance by one party of a writing signed by the other only, and

purporting to embody all the terms of a contract between the two, binds the acceptor as well as

the signer, to the terms of the writing.").  Furthermore, as explained above, the agreement

between deToledano and defendants was not predicated on the execution of a formal agreement.

Hence, a binding contract between the parties existed as of September 7, 2003.

> **B.     Was the Arbitration Provision Fraudulently Induced?**

Plaintiffs contend that defendants fraudulently induced deToledano into agreeing to the

arbitration provision by failing to disclose the true costs of arbitration.  Plaintiffs do not suggest

that deToledano was unaware of the existence of the arbitration provision in the agreement, nor

do they contest that deToledano and O'Connor, during their 2003 telephone conversation,

discussed the possibility of arbitration with respect to any future disagreements over royalties

payments.  See O'Connor Decl. ¶ 8; deToledano Decl. ¶ 6.  Rather, they assert that deToledano

"had no inkling whatsoever that arbitration could be a complicated process involving days of

hearings, costing the parties hundreds of dollars per hour just for the arbitrator's time," and that,

if he had known, he "would never have agreed to such a procedure."  deToledano Decl. ¶ 6.

Under California law, fraud in the inducement "occurs when 'the promisor knows what he

is signing but his consent is induced by fraud.'"  Rosenthal v. Great W. Fin. Sec. Corp., 926 P.2d

1061, 1073 (Cal. 1996) (citing Ford v. Shearson Lehman Am. Express, Inc., 225 Cal. Rptr. 895,

904 (Cal. Ct. App. 1986)) (emphasis omitted).  In such a case, "mutual assent is present and a

contract is formed, which, by reason of the fraud, is voidable."  Id. (internal quotation marks and

emphasis omitted).  According to plaintiffs, the fraud at issue here takes the form of the non-

disclosure of material facts.  "In transactions which do not involve fiduciary or confidential

relations," -- as is the case here -- a contract cause of action for the non-disclosure of material

facts may arise where "the defendant makes representations but does not disclose facts which

materially qualify the facts disclosed, or which render his disclosure likely to mislead."  Warner

Constr. Corp. v City of Los Angeles, 466 P.2d 996, 1001 (Cal. 1970) (footnotes omitted).  In

other words, a "statement that is partial or incomplete may be a misrepresentation because it is

misleading, when it purports to tell the whole truth and does not."  Restatement (Second) of Torts

§ 551 cmt. g (1977), cited in Welch v. California, 188 Cal. Rptr. 726, 733 (Cal. Ct. App. 1983)

(applying tort concepts to contract action).  Additionally, an individual may be liable in contract

for non-disclosure of material facts absent a fiduciary duty or confidential relationship when the

undisclosed "facts are known or accessible only to defendant, and defendant knows they are not

known or reasonably discoverable by the plaintiff."  Warner Constr. Corp., 466 P.2d at 1001.

Plaintiffs contend that O'Connor's failure to explain the potential cost and complexity of

JAMS arbitration to deToledano during their 2003 conversation rendered the statements

O'Connor did make about arbitration likely to mislead.  As deToledano described the

conversation, "O'Connor told me, in a way that from his words and manner was intended to

reassure me and allay my fears, that either side could submit any dispute about the royalty

structure to arbitration."  deToledano Decl. ¶ 6.  Plaintiffs are not arguing, and could not argue,

that O'Connor made affirmative misstatements on the subject of arbitration.  Nor do plaintiffs

suggest that O'Connor "purport[ed] to tell the whole truth" about the ins and outs of arbitration

and then conveniently left out facts about the cost.  Rather, plaintiffs ask the Court to find fraud

based on the likelihood that O'Connor, a lawyer, had superior knowledge about the arbitration

process in comparison to deToledano, an elderly man with no legal training and only one previous experience with arbitration, in the 1940s. See deToledano Decl. ¶ 6. But, absent a duty to disclose, superior knowledge alone is not sufficient to support rescission of a contract based on the non-disclosure of material facts unless "the facts are known or accessible only to defendant, and defendant knows they are not known or reasonably discoverable by the plaintiff," Warner Constr. Corp., 466 P.2d at 1001. See generally Restatement (Second) of Contracts § 161 cmt. a ("A party making a contract is not expected to tell all that he knows to the other party, even if he knows that the other party lacks knowledge on some aspects of the transaction."). Plaintiffs have not demonstrated or even suggested that the "undisclosed facts" concerning the cost of JAMS arbitration were not reasonably available to deToledano. Nor have they cited any case law that recognizes a heightened duty to disclose reasonably discoverable facts where one party is elderly and the other is not, or where one party is a lawyer and the other is not. Accordingly, this Court concludes that deToledano was not fraudulently induced into agreeing to the arbitration provision, and it will not be invalidated on that ground.

### C.    Is the Arbitration Provision Unconscionable under California Law?

Pursuant to the California Civil Code, if a court "as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a) (West 2007). Unconscionability "has both a 'procedural' and a 'substantive' element." Armendariz v. Found. Health Psychare Servs., Inc., 6 P.3d 669, 690 (Cal. 2000). Courts consider these two elements on a "'sliding scale,'" such

that "'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required . . . and vice versa.'" Nagrampa v. Mailcoups, Inc., 469 F.3d 1257, 1280 (9th Cir. 2006) (en banc) (quoting Armendariz, 6 P.3d at 690). However, "[procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine." Armendariz, 6 P.3d at 690 (emphasis added) (alteration in original).

"Procedural unconscionability analysis focuses on oppression or surprise." Nagrampa, 469 F.3d at 1280 (internal quotation marks omitted). "The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party." Kinney v. United HealthCare Servs., Inc., 83 Cal. Rptr. 2d 348, 353 (Cal. Ct. App. 1999). "'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." Stirlen v. Supercuts, Inc., 60 Cal. Rptr. 2d 138, 145 (Cal. Ct. App. 1997) (internal quotation marks omitted). "The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, 'which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" Little v. Auto Stiegler, Inc., 63 P.3d 979, 983 (Cal. 2003). But see Harper v. Ultimo, 7 Cal. Rptr. 3d 418, 424 (Cal. Ct. App. 2003) (clarifying that contract of adhesion "is not a prerequisite for unconscionability").

Plaintiffs did not put forward any arguments in their written submissions to the Court for why the arbitration provision itself is procedurally unconscionable. Plaintiffs' counsel did argue at the motions hearing that the procedural element of unconscionability is satisfied because a

"quick peek at the merits" demonstrates that the <u>overall</u> agreement was fraudulent. Prelim. Tr. of

Mot. Hr'g 53:19, Apr. 13, 2007 ("Hr'g Tr."). With this argument, plaintiffs are essentially asking

this court to exceed its authority in two ways. First, "the statutory language [of the FAA] does

not permit the federal court to consider claims of fraud in the inducement of the contract

generally." <u>Buckeye Check Cashing</u>, 546 U.S. at 445. Second, "in deciding whether the parties

have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential

merits of the underlying claims." <u>AT&T Techs., Inc.</u>, 475 U.S. at 649. Thus, the Court will not

consider this argument further.

Plaintiffs' only other argument for procedural unconscionability, also put forward at the

motions hearing, is that deToledano did not "participate in the crafting of the language of the

agreement." Hr'g Tr. 53:2-10. Again, to the extent this claim pertains to the contract as a whole,

it must be presented to an arbitrator in the first instance.[5] <u>See</u> <u>Buckeye Check Cashing</u>, 546 U.S.

at 449. But even assuming that counsel's reference to "the agreement" can be construed as a

---

[5] The Ninth Circuit has observed, however, that "[a]n argument that the arbitration agreement itself is procedurally unconscionable may be informed, as required by California state substantive law, by a determination of whether it is contained within a larger contract of adhesion." <u>Nagrampa</u>, 469 F.3d at 1276. The correctness of this statement is doubtful in light of the Supreme Court's decision in <u>Buckeye Check Cashing</u>. <u>See</u> <u>Nagrampa</u>, 469 F.3d at 1298-1300 (O'Scannlain, J., dissenting) (arguing that <u>Buckeye Check Cashing</u> precludes district court from considering whether contract is adhesive as part of unconscionability analysis); <u>see also, e.g.</u>, <u>Jenkins v. First Am. Cash Advance of Ga., LLC</u>, 400 F.3d 868, 877 (11th Cir. 2005) ("[T]he FAA does not permit a federal court to consider claims alleging the contract as a whole was adhesive."); <u>Madol v. Dan Nelson Auto. Group</u>, 372 F.3d 997, 1000 (8th Cir. 2004) ("The law required that the plaintiffs' claims be referred to arbitration because their arguments of unconscionability 'cannot fairly be limited to the making of the arbitration clause.'" (citation omitted)). Furthermore, even if this Court were to adopt the Ninth Circuit's view, the evidence here is that the contract was not adhesive or otherwise procedurally unconscionable because deToledano did have bargaining power -- he objected to other clauses in the proposed Agreement, particularly the two-tier royalty arrangement, which were subsequently revised.

challenge to the arbitration provision alone, there is no evidence whatsoever in the record to suggest that deToledano was "'presented the clause and told to take it or leave it without the opportunity for meaningful negotiation,'" Nagrampa, 469 F.3d at 1282 (quoting Szetela v. Discover Bank, 118 Cal. Rptr. 2d 862, 867 (Cal. Ct. App. 2002)).  Given plaintiffs' complete failure to demonstrate procedural unconscionability, then, there is no need to consider whether the arbitration provision was substantively unconscionable at the time it was made.  The provision simply does not qualify as unconscionable under California law.

> **D.      Is the Arbitration Provision Prohibitively Costly?**

Plaintiffs argue that the projected cost of JAMS arbitration for this dispute would discourage them from proceeding with the merits of their claims.  In support of this contention, plaintiffs have submitted to the Court the arbitration fee schedule for Fern M. Smith, one of three available arbitrators named in the "commencement of arbitration" notice sent by JAMS.  See Allison Decl. Ex. J.  The fee schedule lists Judge Smith's professional fee as $6,000 for up to eight hours of hearing time and two hours of research and reading time per day, plus a case management fee of $300 per party per day for hearings of up to three days or 10% of the professional fees for hearings of four days or more.  Id.  Plaintiffs further estimate that a hearing on the merits would take approximately five days; they would call approximately five witnesses, they anticipate that defendants would call between five and ten witnesses, and they expect several dozen exhibits would be introduced.  Pl.'s Opp'n at 21 n.6.

With respect to deToledano's ability to pay, deToledano averred in a declaration:

> I cannot afford the JAMS/Endispute arbitration procedure, which, I am informed, is one-half of $6,000 per day of work by the arbitrator, plus approximately 10% of the arbitrator's fees for administration by JAMS/Endispute.  At 90 years of

age, I live on a fixed income; I receive approximately $4,000 per month gross, between social security and my own retirement provisions. My rent is $1,890 per month, my food and incidentals are approximately $400 per month, in addition to which I pay for telephone, computer-related expenses, postage, publications, and other items. In the most recent calendar year, I had well over $8,000 in out-of-pocket medical expenses. After living expenses and taxes, I have little or no money left over.

deToledano Decl. ¶ 7. Since submitting this declaration, and prior to the motions hearing, deToledano passed away; the Court has not received any information regarding the financial status of deToledano's estate. At the motions hearing, however, plaintiffs' counsel conceded that deToledano could have paid the arbitration costs while he was alive, if not the fees for an attorney to assist him in the arbitration proceeding. Hr'g Tr. 60:8-19.

Plaintiffs are correct that, under certain circumstances, courts have found prohibitively or unreasonably expensive arbitration provisions unenforceable as a matter of law. However, plaintiffs have not distinguished between federal and state law claims for purposes of this argument, even though the two types of claims implicate different bodies of legal precedent. Instead, they rely indiscriminately on cases applying federal arbitration law on the one hand and state unconscionability law (particularly the law of New York) on the other. See Pl.'s Opp'n at 22-24. This Court will first consider whether plaintiffs have sufficiently demonstrated under applicable federal law that the cost of arbitration would effectively preclude deToledano's estate from bringing the federal statutory claims; it will then consider whether the arbitration provision is unenforceable under California law.

"It is by now clear that [federal] statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA," Gilmer, 500 U.S. at 26, at least "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum,"

Mitsubishi Motors Corp., 473 U.S. at 637. See also 5 William F. Patry, Patry on Copyright § 17:194 (2007) ("There is no longer any doubt that claims arising under the Copyright Act may be arbitrated . . . ."). The Supreme Court in Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79 (2000) (hereinafter "Green Tree"), indicated that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." Id. at 90. The plaintiff in Green Tree, Larketta Randolph, attempted to bring claims in federal court under the Truth in Lending Act, 15 U.S.C. § 1601 et seq., against the lender that had financed her mobile home purchase. 531 U.S. at 82-83. Randolph's contract with the lender contained a mandatory arbitration provision that was silent as to which party would bear the cost of arbitration. See id. at 82. After noting that Randolph had "provide[d] no basis on which to ascertain the actual costs and fees to which she would be subject in arbitration," id. at 91 n.6, the Court stated that the "record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable," id. at 91. The Court further observed that "where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." Id. at 92. Although the Court clearly contemplated a burden-shifting framework for such challenges, it reserved for another time the question "[h]ow detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence." Id.

The D.C. Circuit has not yet grappled with the application of Green Tree to challenges like that plaintiffs assert here. Prior to the Green Tree decision, however, the D.C. Circuit held in Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465 (D.C. Cir. 1997), that, with respect to an

arbitration provision encompassing an employee's Title VII claims, "where arbitration has been imposed by the employer and occurs only at the option of the employer . . . arbitrators' fees should be borne solely by the employer." Id. at 1485.  The court of appeals reasoned that, as a general matter, any arbitration fees other than "reasonable costs" analogous to federal-court "filing fees and other administrative expenses" would unduly deter employees from vindicating their Title VII rights.  See id. at 1484; see also id. at 1468 (construing arbitration provision's silence as to costs as requiring employer to pay all arbitration fees).  The continuing vitality of Cole's "per se" rule, however, is in some doubt.  See Nelson v. Insignia/ESG, Inc., 215 F. Supp. 2d 143, 154-56 (D.D.C. 2002).  Post-Green Tree, the D.C. Circuit has refused to extend Cole "beyond the statutory context" to encompass common-law claims.  Brown v. Wheat First Sec., Inc., 257 F.3d 821, 825 (D.C. Cir. 2001).  Furthermore, the rationale of Cole itself was firmly grounded in the employer-employee context, see, e.g., 105 F.3d at 1468, 1473-79, and, in light of Green Tree, it is properly limited to that context.  Hence, this Court will not apply Cole's per se rule against fee splitting in considering whether deToledano must arbitrate his federal statutory claims.

The majority of courts that have had occasion to apply Green Tree's burden-shifting approach to claims of prohibitively expensive arbitration fees have instead adopted a case-by-case analysis.  See EEOC v. Rappaport, Hertz, Cherson & Rosenthal, P.C., 448 F. Supp. 2d 458, 462-63 (E.D.N.Y. 2006) (listing cases); Nelson, 215 F. Supp. 2d at 152-53 (same).  The Fourth Circuit's decision in Bradford v. Rockwell Semiconductor Sys., Inc., 238 F.3d 549 (4th Cir. 2001), is particularly instructive.  The Fourth Circuit believed that "the appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible

substitute to litigation." Bradford, 238 F.3d at 556. Therefore, the Bradford court utilized "a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost difference between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." Id. The Fourth Circuit further observed that

> [t]he cost of arbitration, as far at its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are "too high." Rather, an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs.

Id. at 556 n.5; accord James v. McDonald's Corp., 417 F.3d 672, 680 (7th Cir. 2005) ("The cost differential between arbitration and litigation is evidence highly probative to Ms. James' claim that requiring her to proceed through arbitration, rather than through the courts, will effectively deny her legal recourse."); Faber v. Menard, Inc., 367 F.3d 1048, 1054 (8th Cir. 2004) (finding that "hypothetical discouragement is purely speculative" without "evidence of [plaintiff's] particular financial situation" and arbitration costs). But see Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 663-65 (6th Cir. 2003) (describing revised case-by-case approach that looks to job description and socioeconomic background of similarly situated potential litigants, and to average or typical arbitration and litigation costs, to determine whether substantial numbers of similarly situated individuals would be deterred from bringing their claims in arbitral forum).

This Court agrees with the Fourth Circuit that a case-specific analysis of a plaintiff's ability to pay arbitration costs and a comparison between the costs of litigating versus arbitrating the plaintiff's claims is necessary in order to determine whether the cost of arbitration will

effectively preclude the plaintiff from vindicating his or her federal statutory rights. This case presents somewhat unusual circumstances regarding the first consideration (ability to pay). The Court believes, at least for purposes of deciding a § 3 motion to stay, that a plaintiff's <u>current</u> ability to pay is relevant to whether he or she will be deterred from continuing to pursue federal statutory claims in the looming arbitration proceedings.[6] <u>See</u> <u>Bradford</u>, 238 F.3d at 558 n.7 ("[T]he individual who claims to be financially burdened . . . should raise his objections to the fee-splitting arrangement, including a specific forecast of his expected costs and his <u>expected financial burden</u>, prior to the beginning of arbitration." (emphasis added)). Although deToledano submitted a declaration describing his financial status,[7] the current plaintiffs have not done so on behalf of deToledano's estate.

Despite the lack of information regarding plaintiffs' current ability to pay, this Court's analysis of the second consideration -- the comparative cost of arbitrating and litigating this dispute -- is ultimately dispositive of plaintiffs' challenge to the arbitration provision. Plaintiffs

---

[6]This analysis may differ from that undertaken with respect to prohibitive-cost challenges made pursuant to California unconscionability doctrine, which focuses on the enforceability of the challenged provision at the time it was made. <u>See</u> Cal. Civ. Code § 1670.5(a).

[7]Even though deToledano has stated in conclusory fashion that he could not afford arbitration, <u>see</u> deToledano Decl. ¶ 7, his declaration spoke only to his monthly social security and retirement income and did not provide any information as to his other assets. It is true that the courts of appeals have been reluctant to delineate clearly the level of detail a plaintiff must provide under his initial <u>Green Tree</u> burden. <u>See, e.g.</u>, <u>Morrison</u>, 317 F.3d at 663-64 (stating that district court should take "actual plaintiff's income and resources" into account but noting that "<u>Green Tree</u> 'does not necessarily mandate a searching inquiry into an employee's bills and expenses.'" (quoting <u>Giordano v. Pep Boys--Manny, Moe & Jack, Inc.</u>, No. 99-cv-1281, 2001 WL 484360, at *6 (E.D. Pa. Mar. 29, 2001)). But, under any conceivable standard, and especially in light of counsel's admission that deToledano could have afforded the fees, Hr'g Tr. 60:8-9, deToledano's declaration presented an inadequate, incomplete picture of his financial status that would have been insufficient standing alone to shift the burden to defendants.

have submitted documentation to support their estimate of the cost of arbitrating this dispute with JAMS.  Plaintiffs have never, however, provided the Court with any estimate of the projected cost of this federal-court litigation, including discovery and attorney fees.  It is therefore all but impossible for this Court to evaluate whether the forecasted arbitration costs would unduly prohibit the vindication of plaintiffs' rights under the Copyright Act.  For this reason, plaintiffs have plainly not satisfied their initial burden under Green Tree of showing that the cost of arbitration would be prohibitive.

The Court will now turn to whether the predicted arbitration costs will impede plaintiffs' ability to pursue their common-law claims.[8]  California courts, under a line of precedent that borrows heavily from the D.C. Circuit's opinion in Cole, have invalidated as against public policy those arbitration provisions requiring employees to pay arbitration costs and fees because they might chill the exercise of certain unwaivable statutory or public rights.  See Armendariz, 6 P.3d at 689 ("We therefore hold that a mandatory employment arbitration agreement that contains within its scope the arbitration of FEHA [California Fair Employment and Housing Act] claims impliedly obliges the employer to pay all types of costs that are unique to arbitration."); Little, 63 P.3d at 987 (extending Armendariz "to employer-mandated arbitration of tort claims for wrongful discharge in violation of public policy," Boghos v. Certain Underwriters at Lloyd's of London, 115 P.3d 68, 75 (Cal. 2005)).  But this per-se rule has never been applied outside the employer-

_____

    [8]These claims require a different analysis because Gilmer, and by extension Green Tree, was only concerned with the question "whether dispute resolution under the FAA was consistent with the federal right-creating statute in question."  Brown, 257 F.3d at 826; accord Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 873 (8th Cir. 2004) (refusing to apply Green Tree to claims brought under Texas law); see also James, 417 F.3d at 679 ("It remains unclear whether the rationale of Green Tree applies to situations that do not involve the assertion of federal statutory rights.").

employee context, see Boghos, 115 P.3d at 75, and the California Supreme Court has explicitly refused to extend its reach to "the arbitration of claims not carefully tethered to statutory or constitutional provisions," id. at 76. See also Giuliano v. Inland Empire Personnel, Inc., 58 Cal. Rptr. 3d 5, 16 (Cal. Ct. App. 2007) ("Armendariz does not apply to this case because it is not based on the FEHA or a fundamental public policy that is tied to a constitutional or statutory provision.").[9] Because plaintiffs have not asserted any claims "carefully tethered" to state statutory or constitutional provisions, but instead assert only common-law and federal copyright claims, this line of cases does not apply here.

Finally, an arbitration provision that imposes unaffordable fees upon an individual seeking to arbitrate claims may in some circumstances be substantively unconscionable under California law. See Gutierrez v. Autowest, Inc., 7 Cal. Rptr. 3d 267, 276 (Cal. Ct. App. 2003) ("[I]t is substantively unconscionable to require a consumer to give up the right to utilize the judicial system, while imposing arbitral forum fees that are prohibitively high."); id. at 276 n.9 ("Of course, arbitral costs may be unconscionable for other reasons. For example, a predispute arbitration clause should not impose excessive costs relative to the recovery sought."); Spence v. Omnibus Indus., 119 Cal. Rptr. 171, 173 (Cal. Ct. App. 1975) (striking arbitration provision in contract of adhesion). It remains an unsettled question of California law whether an individual's

---

[9]Application of the Armendariz rule might also be inconsistent with the FAA, which preempts "state laws applicable only to arbitration provisions." Doctor's Assocs., Inc., 517 U.S. at 687 (emphasis omitted); cf. Brown, 257 F.3d at 826 ("Brown also nowhere asserts that D.C. law creates a Cole like requirement for its own common law 'public policy' causes of action. Perhaps this omission is because state restrictions on arbitration are preempted by the Federal Arbitration Act."). But see Little, 63 P.3d at 989 ("The Armendariz requirements are therefore applications of general state law contract principles regarding the unwaivability of public rights to the unique context of arbitration, and accordingly are not preempted by the FAA.").

"ability to pay his share of the [arbitration] costs and fees is relevant to the question of unconscionability and, if so, whether he must prove he is factually unable to pay." <u>Boghos</u>, 115 P.3d at 76. In any event, plaintiffs cannot prevail on a claim of unconscionability based on excessive arbitration costs because they have not established, as they must, that the arbitration provision is also procedurally unconscionable. <u>See, e.g.</u>, <u>Armendariz</u>, 6 P.3d at 690.

In sum, plaintiffs have not demonstrated, under federal or state law, that the arbitration provision is unenforceable due to prohibitive arbitration costs.

### E.    Is O'Connor, a Non-Party to the Agreement, Entitled to a Stay?

Plaintiffs object to O'Connor's attempt to stay this action under the FAA because he is not a party to the contract containing the arbitration provision. In somewhat obscure fashion, defendants simply declare that the claims are arbitrable because O'Connor was acting as the disclosed agent of the Felts. <u>See</u> Defs.' Mem. in Support of Mot. to Stay ("Defs.' Mem.") at 7; <u>see also</u> O'Connor Decl. ¶ 22 ("I at all times negotiating this Agreement was acting only as an agent and not a principal, and therefore consider this action against me to be within the arbitration clause."). This statement is disputed by plaintiffs, who allege that "O'Connor's involvement in these transactions was as a principal, a fact not disclosed to plaintiff." Compl. ¶ 22. Defendants further argue that, even though O'Connor was not himself a party to the arbitration agreement, the claims against him are inextricably intertwined with the claims against the Felts, and therefore all claims must be submitted to arbitration together. Defs.' Mem. at 7; Defs.' Reply at 13. The precise issue before this Court, however, is whether O'Connor may obtain a mandatory stay under § 3 of the FAA, and, if not, whether he is nonetheless entitled to a stay pursuant to the discretion of the Court.

-33-

Under § 3 of the FAA, a district court "<u>shall</u> on application of one of the parties" stay the litigation until the completion of arbitration "upon being satisfied that the issue involved in such a suit or proceeding is referable to arbitration" under "an agreement in writing." § 3 (emphasis added). "Although not expressly so limited, section 3 assumes and the case law holds that the movant for a stay, in order to be entitled to a stay under the arbitration act, must be a party to the agreement to arbitrate, as must be the person sought to be stayed." <u>IDS Life Ins. Co. v. Sunamerica, Inc.</u>, 103 F.3d 524, 529 (7th Cir. 1996). Nonetheless, numerous appellate opinions from other circuits "have recognized a number of common law principles of contract [and agency] law that may allow non-signatories to enforce an arbitration agreement" under the FAA. <u>Ross v. Am. Express Co.</u>, 478 F.3d 96, 99 (2d Cir. 2007); <u>see also, e.g.</u>, <u>Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH</u>, 206 F.3d 411, 416-17 (4th Cir. 2000) ("Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."). It may be that the D.C. Circuit, perhaps alone among the circuits, would strictly construe the FAA to allow a § 3 stay only when the exact parties involved "are signatories to a written agreement to arbitrate," <u>DSMC Inc.</u>, 349 F.3d at 683, regardless of whether contract or agency principles would render the non-signatory otherwise bound by the agreement. This Court need not attempt to divine the answer here, however. Even assuming that general principles of agency law govern whether a non-signatory may enforce a written agreement to arbitrate under the FAA, and even assuming that O'Connor acted as an agent of the Felts (a fact contested by plaintiffs), this Court concludes that he cannot compel a stay pursuant to § 3 of the FAA.

In considering whether O'Connor is entitled to enforce the arbitration provision as an

agent of the Felts, this Court will look to the "'federal substantive law of arbitrability,'" Int'l Paper Co., 206 F.3d at 417 n.4 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)), which in turn "incorporates general principles of contract and agency law," InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003). It is black-letter law that "[w]hen an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, . . . the agent is not a party to the contract unless the agent and third party agree otherwise." Restatement (Third) of Agency § 6.01 (2006). Accordingly, "[i]f an agent does not become a party to a contract and is not subject to liability on the contract as an individual, the agent should not be able to assert rights as an individual derived from the contract in the absence of indicia that the parties to the contract so intended." Id. § 6.01 cmt. d(1). In the context of arbitration agreements, this principle has been applied by courts to preclude an agent who was not a signatory to an agreement between the principal and a third party from attempting to enforce the arbitration agreement against the third party. See Westmoreland v. Sadoux, 299 F.3d 462, 466 (5th Cir. 2002); McCarthy v. Azure, 22 F.3d 351, 361 (1st Cir. 1994); see also Restatement (Third) of Agency § 6.01 illus. 13. But see Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1122 (3rd Cir. 1993) (finding arbitration clause binding on "agents of the party who signed the agreements"). In the First Circuit's view, allowing arbitration "would introduce a troubling asymmetry into the law" -- "the agent, though he could not be compelled to arbitrate, nonetheless could compel the [third party] to submit to arbitration." McCarthy, 22 F.3d at 361.[10]

---

[10]Concerns that the nonsignatory could attempt to reap the benefit of the agreement and yet avoid arbitration under the agreement are allayed by the possibility of a discretionary stay based on equitable estoppel grounds, as discussed below. See Westmoreland, 299 F.3d at 466-67 (discussing equitable estoppel).

This Court agrees, and therefore holds that O'Connor may not, under general agency principles, take advantage of the arbitration provision and obtain a § 3 stay.

Defendants also seek a stay pursuant to § 3 based on the intertwining of the claims against O'Connor with the claims against the Felts. Several circuits have allowed a non-signatory to enforce an arbitration agreement against a signatory based on such equitable estoppel grounds, apparently pursuant to the FAA. As the Second Circuit has explained, "[i]n these cases, a signatory was bound to arbitrate with a nonsignatory at the nonsignatory's insistence because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were 'intimately founded in and intertwined with the underlying contract obligations.'" Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995) (alterations in original) (quoting Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993)); see also, e.g., CD Partners, LLC v. Grizzle, 424 F.3d 795, 799 (8th Cir. 2005) ("The courts clearly recognize a nonsignatory's ability to force a signatory into arbitration under the 'alternative' estoppel theory when the relationship of the persons, wrongs and issues involved is a close one.").

In the D.C. Circuit, however, "there is no precedent . . . compelling a party to an arbitration agreement to arbitrate with a non-signatory on the basis of equitable estoppel." DSMC Inc., 349 F.3d at 683. In its only opinion addressing the issue, the court of appeals did not decide "whether such an effort can ever succeed," but it did hold "that an effort to compel arbitration in such circumstances on the basis of equitable estoppel does not fall within Section 4 of the FAA." Id. The court reasoned that § 4 applies only to an alleged failure to arbitrate

"'under a written agreement for arbitration' -- not an alleged failure to arbitrate when principles of equitable estoppel indicate that you should." Id.  Likewise, the court concluded that "the mandatory stay provision of Section 3," which by its terms also requires a written agreement, "does not apply to litigation involving parties not subject to a written arbitration agreement." Id. at 685.  Thus, "[e]ven assuming that the issues involved in the . . . litigation and the . . . arbitration are identical, intertwined, closely related, whatever . . . the litigation may not be stayed under Section 3 because the issues in the litigation are not 'referable to arbitration under an agreement.'" Id. at 684.  It is therefore clear that, under the law of this Circuit, O'Connor may not succeed in obtaining a mandatory stay pursuant to the FAA based on equitable estoppel grounds.

   That is not the end of the matter, however, because O'Connor may still be entitled to a stay through this Court's exercise of discretion.  DSMC Inc. does not foreclose such consideration.  See 349 F.3d at 684-85.  The Supreme Court has observed that "[i]n some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration" -- a decision that is "left to the district court . . . as a matter of its discretion to control its docket." Moses H. Cone Mem'l Hosp., 460 U.S. at 21 n.23.  Although the D.C. Circuit has not had occasion to review the denial of a discretionary stay based on an equitable-estoppel theory, it has observed that the "application of equitable estoppel . . . requires a multifactor factual and legal inquiry to determine whether the issues to be litigated by the non-signatory and signatory are sufficiently intertwined with the issues subject to arbitration." DSMC Inc., 349 F.3d at 683-84.  Other circuits have approved of stays when "'third party litigation . . . involves common questions of fact that are within the scope of the arbitration agreement,'" AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 242 F.3d 777, 782 (8th Cir.

2001) (citation omitted), or under "the normal rules for parallel-proceeding abstention," IDS Life Ins. Co., 103 F.3d at 529 (citing, inter alia, Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)). The claims against O'Connor qualify for a discretionary stay under any of these standards. Plaintiffs' claims against O'Connor are premised on identical facts and legal theories as their claims against the Felts. Given that this Court must under the FAA stay the claims against the Felts pending arbitration,[11] it will also exercise its discretion to stay the claims against O'Connor pending that arbitration.

\*    \*    \*    \*

For the reasons just explained, the Court concludes that the arbitration provision in the Agreement is enforceable with respect to the claims against Felt Jr. and Felt Sr. Furthermore, plaintiffs have not contested that their claims against those defendants fall within the scope of that provision, which is broadly worded to encompass "any dispute under this Agreement, or in any way related to the subject matter of this Agreement." Oct. 27, 2003 Letter at 3 ¶ 7; see, e.g., John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1075 (3rd Cir. 1997) (explaining that meaning of "arising in relation to" is even broader than "arising under" when used in arbitration provision). Hence, the Court finds that all of plaintiffs' claims against Felt Sr. and Felt Jr. are "referable to arbitration," and that this action must be stayed pursuant to the FAA with respect to those claims. The Court also exercises its discretion to stay the parallel claims against O'Connor pending the outcome of the arbitration. Accordingly, defendants' motion for a stay of

---

[11]Although Felt Jr. did not file his own motion to stay pursuant to § 3 of the FAA, the Court finds that the claims against him are referable to arbitration for the same reasons that it has found that the claims against Felt Sr. must be arbitrated in the first instance. Thus, the Court stays those claims pursuant to the FAA.

the district-court action is granted in part and denied in part, and plaintiffs' motion to stay the arbitration proceedings is denied.

## II.    Motion to Transfer Venue

A district court may, for "the convenience of parties and witnesses" and "in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). A party seeking a transfer pursuant to § 1404(a) bears the burden of establishing (1) that the plaintiff initially could have brought the action in the proposed transferee district, and (2) that considerations of convenience and the interests of justice weigh in favor of transfer to that district. See Brannen v. Nat'l R.R. Passenger Corp., 403 F. Supp. 2d 89, 92 (D.D.C. 2005). "The moving party 'bear[s] a heavy burden of establishing that plaintiffs' choice of forum is inappropriate.'" Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc., 196 F. Supp. 2d 21, 31 (D.D.C. 2002) (quoting Pain v. United Tech. Corp., 637 F.2d 775, 784 (D.C. Cir. 1980)).

Defendants have asked for a transfer of this action to the United States District Court for the Northern District of California. Although plaintiffs suggest that this action could not have been brought originally in that district, venue there would have been proper under 28 U.S.C. § 1391(b), which provides that a civil action may be brought in a judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred." The Agreement and Assignment were drafted in San Francisco, and deToledano sent the related correspondence to O'Connor at his place of business in San Francisco; in other words, a roughly equal amount of activity took place in northern California as in Washington, D.C. That is sufficient to satisfy § 1391(b).

This Court must then undertake "'an individualized, case-by-case consideration of convenience and fairness,'" Stewart Org., Inc v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)), an inquiry that involves the weighing of a number of private-interest and public-interest factors, see Trout Unlimited v. U.S. Dep't of Agric., 944 F.Supp. 13, 16 (D.D.C.1996). These private-interest considerations include: (1) the plaintiffs' choice of forum; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may be unavailable for trial in one of the fora; and (6) the ease of access to the sources of proof. Id. (citations omitted). Relevant public-interest considerations include: (1) the transferee court's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in adjudicating local controversies at home. Id.

Defendants focus primarily on the private-interests inquiry. First, they argue that the action should be transferred for the convenience of the parties, particularly Felt Sr., who is in his early nineties, in ill health, and unable to travel long distances. O'Connor Decl. ¶¶ 12, 13. Defendant O'Connor, currently a solo practitioner in San Francisco, has averred that he would be inconvenienced with respect to his law practice if required to be in D.C. for long periods of time. Id. ¶ 2. Second, defendants argue that the Northern District of California would be more convenient for the anticipated non-party witnesses: Joan Felt, daughter of Felt Sr., who lives in northern California and would testify to the merits of plaintiffs' claims; representatives of the Creative Artists Agency in Los Angeles, who would testify as to damages; and representatives of Universal Studios in Los Angeles, who would also testify as to damages. Id. ¶¶ 16, 20, 21.

Finally, they argue that access to proof favors the Northern District of California because documents related to damages, such as agreements with agents and movie studios, would be located in southern California.

On the other side of the private-interests coin, Felt Jr., the remaining defendant who is not a party to the motion to transfer, lives in Florida and is also in ill health. Furthermore, when questioned at the motions hearing, counsel for defendants agreed that it would be possible to videotape a deposition of Felt Sr., which would allow him to avoid being present at trial altogether. Hr'g Tr. 28; see also Thayer/Patricof Educ. Funding, 196 F. Supp. 2d at 34 ("Even witnesses unwilling to appear at trial can be subjected to videotape depositions that adequately capture their demeanor and credibility for purposes of a trial."). Plaintiffs' witnesses (and sources of proof) will primarily be located in Washington, D.C., and plaintiffs suggested at the motions hearing that more witnesses will be required than originally planned in light of deToledano's death. It is also worth noting that only one of defendants' proposed witnesses actually lives in the Northern District, as opposed to the Central District, of California; this fact may account for defense counsel's inability at the motions hearing to identify the district in California to which transfer was being sought. See Hr'g Tr. 27, 30-31

With respect to public-interest factors, defendants suggest that judicial economy favors transfer. They argue that, if this case proceeds to arbitration in San Francisco, it would be "more efficient and economical for the parties with their voluminous files to proceed almost just across the street to the courthouse, rather than across the country," in order to enforce or challenge the resulting arbitration award. Def.'s Mem. at 12. Given the advent of electronic case filing, not to mention the continued existence of old-fashioned mail and courier services, it is hard to see why

the location of the arbitration weighs heavily in favor of a transfer.  Finally, defendants argue that, if plaintiff wins injunctive relief, it would be easier to monitor (in southern California) the movie studio and literary agents' compliance with a court order from northern California than from Washington, D.C.  The court finds this argument equally unpersuasive.

Defendants have not met their heavy burden of showing that plaintiffs' choice of forum in this district is inappropriate.  Because considerations of convenience and the interests of justice do not weigh in favor of transferring this action to the Northern District of California, defendants' motion to transfer is denied.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part defendants' motion to stay, denies plaintiff's motion to stay, and denies defendants' motion to transfer venue. A separate order accompanies this memorandum opinion.

     /s/ John D. Bates     
JOHN D. BATES
United States District Judge

Dated:  August 17, 2007